**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James W. DOUGLASS,
Defendant-Appellant.**

**No. 78–1034.**

United States Court of Appeals,
Ninth Circuit.

Aug. 4, 1978.

William J. Bender, Seattle, Wash., for defendant-appellant.

Jerry Diskin, Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before TRASK and SNEED, Circuit Judges, and SKOPIL,* District Judge.

SNEED, Circuit Judge:

This case arises out of protests against the construction and use by the United States of the Trident class nuclear submarine. These protests involved activities concentrated in and about the Naval Submarine Base, Bangor, Bremerton, Washington. The appellant was convicted of violating the second paragraph of 18 U.S.C. § 1382 [1] because of certain conduct by him on July 21, 1977. He appeals contending (1) that he did not reenter that portion of the reserva-

---

* Hon. Otto R. Skopil, Jr., United States District Judge for the District of Oregon, sitting by designation.

1. The second and third paragraphs of § 1382 provide that

Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—

Shall be fined nor more than $500 or imprisoned not more than six months, or both.

tion with respect to which the United States, acting through the commanding officer, had the exclusive right of use; (2) that 18 U.S.C. § 1382 as applied to him is unconstitutional in several respects; (3) that 18 U.S.C. § 1382 is overbroad in its reach and because of its unconstitutionality, as it might be applied to others, cannot provide the basis of appellant's conviction, and (4) that his conviction should be set aside because he is the victim of impermissible selective prosecution.

We reject these contentions and affirm the conviction.

## I.

### FACTS.

The facts that are relevant to this appeal are as follows. On July 4, 1977, appellant Douglass crossed a fence of the base and entered that portion of the base situated therein to participate along with others in a "picnic" intended as a form of civil disobedience. To accomplish the warning required by 18 U.S.C. § 1382, the Commanding Officer at Bangor, on July 5, 1977 issued, and appellant received, a "bar letter" ordering him not to reenter, "or to be found within the limits of" the base. (R.T. 34). On July 20, following the arrest of three individuals, appellant again entered military property to inquire about their status. He was warned at that time that he had been barred and would be arrested if he should reenter. The next day appellant and others were seen near the old Main Gate of the base. A number of protesters entered the property to leaflet workers. Appellant remained an onlooker apart from the others. Upon seeing their arrest, however, appellant entered military property, headed for a phone booth used by the public for the purpose of calling attorneys and reporters about the incident, and was arrested upon entering the booth. The booth was located behind a clearly marked white boundary line, but was outside the fence of the base and on the street side of the guard house. At his trial before a magistrate, appellant testified that he was aware that he was entering government property. He was found guilty and sentenced to five days imprisonment.

## II.

### Exclusive Right of Use.

■ Violation of 18 U.S.C. § 1382 requires (1) reentry of a reservation, post, etc. by the accused (2) after having been removed or ordered not to reenter (3) by the commanding officer or person in command or charge thereof. It is obvious that appellant's conduct constituted a violation if it can be said that his crossing the white line to use the phone booth constituted a reentry of the base. We hold that it did.

Appellant argues that, without regard to such rights as the First Amendment affords, the area that he traversed between the white line and the phone booth was not a part of the base because the United States did not have the requisite ownership and possession of the area to enable it to exclude the appellant. *See United States v. Holmes,* 414 F.Supp. 831, 838 (D.Md.1976); *United States v. Watson,* 80 F.Supp. 649 (E.D.Va.1948). To support this contention the appellant points to the stipulated facts of this case which, *inter alia,* make clear that the area in question was not within a so-called "security" or "controlled" area of the base and that the public used the phone booth, the limited number of parking stalls, and the walks which were within the white line but outside the perimeter fence.

This is not enough. The appellant at no time has challenged the title of the United States to the area in question. Moreover, no easement residing in the public with respect to this area, arising either by grant or by reservation, has been shown to exist. Nor does the record reflect any relinquishment of control over the area by the base personnel. (R.T. 43, 60). In addition, the boundary of the reservation is well marked by the white line, the location and meaning of which was well known to the appellant. Mere toleration of certain uses by the public designed for their convenience does not result in the loss of the right to exclusive use. Under these circumstances the requi-

site ownership and possession of the United States has been established. *See United States v. Packard,* 236 F.Supp. 585 (N.D. Cal.1964). It follows, therefore, that the appellant violated 18 U.S.C. § 1382.

## III.

### *Vagueness.*

■ To avoid the consequences of this conclusion, appellant makes several constitutional arguments. The first, already impliedly refuted by our analysis to this point, is that 18 U.S.C. § 1382 is void for vagueness. We hold that it satisfies the general test set forth in *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), *viz.,* whether a person "of common intelligence must necessarily guess at [the law's] meaning and [would] differ as to its application . . .."

■ The statute is neither long nor complex; it incorporates no imprecise common law phrases. *See, e. g., Jordan v. De George,* 341 U.S. 223, 230–32, 71 S.Ct. 703, 95 L.Ed. 886 (1951). The possibility that close questions, such as whether a communication was a valid order not to reenter or properly given by the commanding officer, can arise does not make the statute unconstitutionally vague. "Impossible standards of specificity are not required." *Id.* at 231, 71 S.Ct. at 708. Finally, as already indicated, the appellant acknowledged during the trial a full and complete understanding of the meaning of the statute under which he was prosecuted.

## IV.

### *First Amendment Rights of Appellant.*

Appellant's primary contention fashioned to overturn his conviction is that, in crossing the white line marking the boundary of the reservation and walking to the phone booth to telephone the press and attorneys regarding the earlier arrest of his companions in protest, he was engaged in activity protected by the First Amendment, which he was as free to pursue in that place as he would have been had he done so on a public street. His primary authority is *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) in which a conviction under 18 U.S.C. § 1382 for "quietly distributing leaflets on New Braunfels Avenue at a point within the limits of Fort Sam Houston, San Antonio, Texas" was overturned by a per curiam opinion without oral argument. The Supreme Court in *Flower* considered New Braunfels Avenue "no different from all other public thoroughfares in that city, and that the military had not only abandoned any right to exclude civilian vehicular and pedestrian traffic from the avenue, but also any right to exclude leaflete[e]rs . . . .." *Greer v. Spock,* 424 U.S. 828, 835, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976).

To avail himself of *Flower* the appellant must establish that his reentry actions should be treated as was leafleteering and that the area within which he reentered should be treated as was New Braunfels Avenue. Appellant more nearly succeeds as to the former than he does as to the latter. Although the magistrate at the trial found that the appellant was not engaged in "activity protected under the First Amendment," we are prepared to assume, without so deciding, that appellant was engaged in conduct that was "intertwined with expression and association." *Cox v. Louisiana,* 379 U.S. 536, 563, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). We hold, however, that the area in which the appellant reentered was not the equivalent of New Braunfels Avenue.

■ In a series of cases, the Supreme Court has recognized the concept of a "public forum," an area where the government cannot regulate speech-related conduct except in narrow non-discriminatory ways shown to be essential in serving significant governmental interests. *See generally* L. Tribe, *American Constitutional Law,* 688–93 (1978); H. Kalven, *The Concept of the Public Forum: Cox v. Louisiana,* 1965 Sup.Ct. Rev. 1. A hierarchy of forums emerges from the cases. At one extreme—and most protected from any form of regulation—are

areas such as public streets, such as New Braunfels Avenue, and parks, traditionally recognized as centers for the public communication of ideas.[2] Less protected are facilities such as libraries and schools, where the government has the power to limit speech to maintain the order required to carry on the purpose of those institutions.[3] Least shielded from regulation are public institutions which do not perform speech-related functions at all—such as hospitals, jails or military bases.[4] Here the government is free to exclude even peaceful speech and assembly which interferes in any way with the functioning of those organizations. The basic thrust of these cases is to limit regulation to that which proscribes expression that is "basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). *Cf. Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

The controlling authority with respect to regulation of speech on a military base is *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) in which it was recognized that a "generalized constitutional right to make political speeches or distribute leaflets" (*id.* at 838, 96 S.Ct. at 1217) on military bases does not exist. The essence of the Court's reasoning appears in two observations:

> "In short, it is 'the primary business of armies and navies to fight or be ready to fight wars should the occasion arise'." *Id.* at 837–38, 96 S.Ct. at 1217, quoting from *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 100 L.Ed. 8.

> "The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is thus historically and constitutionally false." *Id.* at 838, 96 S.Ct. at 1217.

Put succinctly, to permit the use of a military base as a public forum is fundamentally incompatible with the purpose of the base. Those who would urge such use would no doubt be among the first to decry the military's "entanglement with partisan political campaigns of any kind." *Id.* at 839, 96 S.Ct. at 1218. Yet their promptings, if yielded to, inescapably would tend to bring about precisely that entanglement.

■ It follows that appellant's conduct, even though perhaps "intertwined with expression and association," can be barred from the Bangor base. It enjoys no First Amendment immunity from such a ban. Nor, as we have indicated, can appellant demonstrate that *Flower* controls. The military authorities at Bangor had not made the area in question an "important traffic artery used freely by buses, taxi cabs and other public transportation facilities as well as by private vehicles" and whose "sidewalks are used extensively at all hours of the day by civilians as well as by military personnel." 407 U.S. at 198, 92 S.Ct. at 1843. The public, to enter a controlled access base, must first approach the gate, but their continuing presence before the gate does not suffice to make this "door step" of the base a public forum.

## V.

### *Overbreadth.*

■ Appellant also invokes the doctrine of facial overbreadth, frequently employed

2. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Hague v. C. I. O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

3. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *but see*

*Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (Negroes' attempt to use segregated library facility not a breach of peace).

4. *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

in First Amendment cases, and asserts that even if 18 U.S.C. § 1382 is constitutional as applied to him he is entitled to assert its unconstitutionality on behalf of those who would refrain from constitutionally protected speech because of the existence of the statute. This doctrine, described by the Supreme Court in *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) as "strong medicine," has not been used freely when invoked against criminal or other laws, applicable to conduct within "the shadow of the First Amendment," *id.* at 614, 93 S.Ct. at 2917, when applied "in a neutral noncensorial manner." *Id.* The Court in *Broadrick* observed:

> "But the plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' towards conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe."

*Id.* at 615, 93 S.Ct. at 2918.
The caution this passage reflects has not been put aside by more recent pronouncements of the Court. *See Federal Communications Commission v. Pacifica Foundation*, —— U.S. ——, ——, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

The statute the appellant challenges plainly subjects to control conduct which could be both harmful (*e. g.*, reentering a base to damage property after being prop-erly barred) and constitutionally unprotected. It reflects legitimate state interests. To predict how it will affect the First Amendment protected speech of others requires assumptions regarding their courage and the depth of their commitment which are difficult to construct. It demeans a citizenry however, to assume lightly that a statute like that before us will induce craven silence in the face of even slight wrongs, much less grievous ones. We decline to so demean our citizens. The appellant's argument fails; the statute is not facially overbroad.

## VI.

### *Discriminatory Selective Prosecution.*

■ Appellant argues finally that his conviction should be set aside because he was subject to discriminatory selective prosecution. To establish improper selective prosecution, appellant must show that (i) there were others similarly situated who were not prosecuted; and (ii) he was chosen for prosecution on the basis of some impermissible criterion, such as race or a desire to discourage exercise of constitutionally-protected rights. *United States v. Scott*, 521 F.2d 1188, 1195 (9th Cir. 1975).

■ Appellant presents no evidence to suggest that he was chosen for prosecution on the basis of an improper criterion. This makes it unnecessary to consider whether there were others similarly situated. However, the stipulation, upon which the trial was based in part, does reveal that seventeen people other than appellant received bar letters, one for entering the fenced area itself and sixteen for entering the intermediate zone between the fence and the white line. All demonstrators, other than appellant, who were arrested were engaged in leafletting, and the stipulation states that the government did not prosecute those individuals because it felt they were engaged in speech-related activities. Such a decision is well within the discretion of the prosecutor; moreover, it reveals a solicitude for First Amendment activities on the part of the government. To penalize this under the

circumstances of this case would overindulge even our taste for irony.

. AFFIRMED.