**UNITED STATES of America, Plaintiff,**

v.

**Ronald C. RENKOSKI, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Mary L. KNEBEL, Defendant.**

Nos. 86–00147–01–CR–W–6, 86–00148–01–CR–W–6.

United States District Court, W.D. Missouri, W.D.

Oct. 2, 1986.

James L. Crabtree, Overland Park, Kan., for defendant Renkoski.

Henry M. Stoever, Kansas City, Mo., for defendant Knebel.

John Osgood, Asst. U.S. Atty., Kansas City, Mo., for the U.S.

## MEMORANDUM AND ORDER

SACHS, District Judge.

The two defendants are religiously-motivated nonviolent protestors against preparation for nuclear warfare. Pursuant to customary arrangements between protest organizers and the security officer at Whiteman Air Force Base, on April 5, 1986, they appeared at the Warrensburg gate to demonstrate their concerns. Air Force personnel, having been notified by the leaders of the anticipated protest, followed past practice in placing a cordon in a grassy area at the approaches to a gate house. Defendants and others made a ritual entry past the containing rope but in front of the gate house, where they were detained, questioned and handed a "bar letter" previously signed by the commander, prohibiting further entries. One of the defendants had received a similar letter on August 9, 1985, while commemorating in like manner the Fortieth Anniversary of the bombing of Nagasaki. The other defendant had received such a letter on a Good Friday protest on April 20, 1984. Since both letters were of two years' duration, the entries in 1986 were in literal violation of 18 U.S.C. § 1382. Prosecutions followed.

Because punishment is limited to a maximum of six months' imprisonment, the case was tried to the court without a jury. A jury demand was rejected.

Whiteman Air Force Base is a "closed" facility, although authorization to enter seems to be rather freely granted. Defendants' violation of the statute seems clear, except for three issues discussed below.[1]

■ The Base is fenced, except for gates guarded by gate houses. All the events in question took place outside the fence. On ordinary days, when an entry is not planned, the area in question is open to the public and peaceful demonstrations would thus be allowable under *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972). Mere title to real estate does not allow issuance by the Government of a "ban and bar" notice. The area in question must be controlled. Even a temporary special form of control, such as a cordon, would doubtless suffice. *See United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985), where the use of cordons was mentioned.

The roping of a portion of the approaches to the gate house is apparently undertaken at the sole discretion of the security officer of the Base, and there is no direct showing of approval by the Base commander. Since a bar letter can only be issued by the commander, it is arguable that only the commander could close or open certain areas of the Base. I conclude, however, that the placement of a cordon would be an activity delegable to the security officer. The implicit approval of the Base commander may be inferred, given the history of the practice.

In post-trial briefing, defendant Knebel contends that the cordon was an unlawful obstruction, interfering with the highway right-of-way. It seems conceded, however, that the fence was properly placed. My understanding of the testimony was that the cordon and a stripe on the driveway

---

1. I find it unnecessary to deal explicitly with a variety of other defenses, such as purported "necessity" imposed by conscience and the newly approved Genocide Treaty.

simply extended the fenceline, so that if the fence location is uncontested the placement of the cordon cannot be contested. I find no basis for concluding that the cordon was an unlawful obstruction.

 A more serious question is posed by the motivation of the security officer. It is doubtful that the cordon is placed across the grassy area for normal security reasons. Rather, it is an accommodation to the protestors, in order to avoid the greater inconvenience and possible traffic hazard of detaining protestors at the gate house or, perhaps, if they should climb a fence. The question presented, therefore, is whether the court is faced with a crime or a theatrical performance.

Words not spoken in earnest do not create a contract, if lack of intent is known to both parties. Similarly, if the cordon is a mere stage prop, rather than a means of temporarily recapturing control over the grassy area, it is unlikely that crossing the barrier has legal significance.

There is little doubt as to the seriousness of defendants' motivation. They were seeking to enter the base as part of a ritual of protest or to be detained upon entry. The security officer's motivation (while entirely benign and commendable) creates the problem.

There is testimony that if, after the cordon is laid down, a pedestrian seeking lawful entry to the Base were to go under or over the rope on the way to the gate house, a guard would stop the pedestrian to make inquiry. One may speculate, however, that the guard would likely wave an ordinary pedestrian along to the gate house where credentials might be checked, by telephone or otherwise. It is arguable, therefore, that the cordon is simply a device for picking up acknowledged protestors in an essentially uncontrolled area rather than an instrumentality securing a genuinely closed area.

Neither side pursued the court's questioning about normal pedestrian traffic. The court will accept the bona fides of the cordon, for present purposes, because (1) it is not clear that the guard at the rope would not make full inquiry of an ordinary pedestrian, and (2) probably the avoidance of a possible traffic hazard is itself a valid security interest.[2]

The Clerk will therefore record my verdict of guilty as to both defendants. SO ORDERED. Sentencing will be scheduled after preparation and review of reports of presentence investigations. Defendants will remain at liberty subject to previously imposed terms and conditions pending further order of the court.

---

**2.** The other side of the argument is that, with protestors as cooperative as these groups, the prearrangement might just as well include an agreement to approach the gate house one by one, when there is no vehicular traffic. The traffic hazard contention borders on unreality, but I accept it in the absence of contest.