UNITED STATES of America, Plaintiff-Appellee,

v.

Kristine D. VASARAJS, Defendant-Appellant.

No. 88–3010.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 1989.

Decided July 6, 1990.

As Amended Aug. 15, 1990.

Nancy Shaw, and Sidney K. Billingslea, Asst. Federal Public Defenders, Anchorage, Alaska, for defendant-appellant.

Kathryn Stone, Sp. Asst. U.S. Atty., Anchorage, Alaska, for plaintiff-appellee.

Peter J. Comodeca, Dept. of the Army, Office of the Judge Advocate, Washington, D.C., for plaintiff-appellee.

Before BROWNING, ALARCON and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Kristine Vasarajs appeals her conviction, following a trial by a magistrate which was affirmed by a district court, for unlawful reentry onto a military reservation in violation of 18 U.S.C. § 1382.[1] Vasarajs con-

---

**1.** The statute provides, in relevant part, that "[w]hoever reenters or is found within any such

tends that the district court erred in confirming the magistrate's determination that she violated 18 U.S.C. § 1382 by knowingly crossing an identifiable border of a military reservation from which she had been barred. She argues that she did not have fair notice of the boundary of the reservation and that she did not willingly enter the main gate when required to do so by military police. We affirm appellant's conviction.

## I

On or about July 18, 1984, Colonel Victor E. Micol, Jr., as post commander, issued a barment letter indefinitely forbidding Vasarajs from returning to Fort Richardson ("the Fort") because of past misconduct involving illegal drugs on the Fort. Vasarajs received this letter, which stated in part that "[u]pon receipt of this letter, you are ordered not to reenter or be found within the limits of Fort Richardson, Alaska." It further warned that should Vasarajs reenter she would be subject to prosecution under 18 U.S.C. § 1382.

Fort Richardson, a military reservation occupying a large area north of Anchorage, Alaska, is bisected by Glenn Highway ("the highway"), a public divided highway. On March 14, 1987, Vasarajs turned off the highway and approached the main gate at the Fort for the purpose of driving two passengers to an organized dance being held on the base. On the access road, while approaching the main gate, Vasarajs passed one sign stating "Welcome to Fort Richardson," and a second warning "You are now entering a military reservation, you are subject to search at any time." Upon approaching the gate, Vasarajs observed that a search of other cars was in progress and changed her mind about entering the Fort. At the gate, Vasarajs indicated that she did not want to enter, but was told that she would have to pass the guard shack for inspection. She was directed to a second gate for a search.

On March 23, 1987, the Special Assistant United States Attorney filed an information charging Vasarajs with entry upon a military reservation after being ordered not to return in violation of 18 U.S.C. § 1382. Vasarajs was tried before a United States magistrate and found guilty. She was sentenced to pay a fine of $300, conditioned upon not committing a similar offense for a period of one year; $250 of the fine was suspended. On appeal, the United States District Court for the District of Alaska affirmed and imposed a special assessment fee pursuant to 18 U.S.C. § 3013. Vasarajs timely appeals.

## II

The magistrate found Vasarajs guilty of unlawful entry. Based upon testimony that the boundary of Fort Richardson extends to the edge of the highway, the magistrate concluded that Vasarajs had already entered the Fort when she changed her mind and requested to leave. The district court agreed. Vasarajs' primary contention on appeal is that she did not realize she had entered Fort Richardson prior to reaching the guard shack. She builds what in effect are two separate arguments around this contention. The first is that the United States, despite holding title to the land extending from the guard shack out to the highway, ceded control of this property to the public at large and thus cannot exclude anyone from this area. The second argument is that due process requires that a person entering a military reservation be provided with objectively reasonable notice of the boundaries of the reservation. We address each argument in turn.

### A

■ Vasarajs argues that because the public is allowed to traverse that portion of road between the end of the exit ramp off the highway and the guard shack, the government has relinquished its control

---

[military] reservation ... after having been ... ordered not to reenter by any officer in command or charge thereof—[s]hall be fined not more than $500 or imprisoned not more than six months or both." 18 U.S.C. § 1382.

over this area despite its legal title to the land. We disagree.

■ As an initial matter, we are reluctant to agree that the government's failure to exercise visible control over its property necessarily results in an inability to exclude others or use the property in any way it sees fit. Appellant's theory seems to be that lack of control leads directly to a loss of the *right* to control. To be sure, a line of cases suggests that the fact that the United States has title to land contained within a reservation is insufficient to prove that the land is part of the reservation. But these cases merely stand for the uncontroversial proposition that record title does not unfailingly denote the title holder's "absolute ownership, or an exclusive right to the possession" of the property in question, *United States v. Watson,* 80 F.Supp. 649, 651 (E.D.Va.1948); *see also United States v. Holmes,* 414 F.Supp. 831, 838 (D.Md.1976). A servitude may exist on the land.[2] *See Watson,* 80 F.Supp. at 651 (easement residing in the public). Alternatively, title itself may have been taken away from an initial owner by adverse possession. Barring these relatively rare situations which can only arise pursuant to application of exacting statutory or common-law rules requiring at a minimum abandonment for a specified period of time, *see Texaco, Inc. v. Short,* 454 U.S. 516, 526 (1982), whoever owns a given parcel of land should have the right of exclusive control. There is no generalized notion of abandonment in property law apart from these highly particularized rights. *See generally United States v. Douglass,* 579 F.2d 545, 547 (9th Cir.1978) ("Mere toleration of certain uses by the public designed for their convenience does not result in the loss of the right to exclusive use.").

■ Significantly, Vasarajs has never argued that either she in particular or the public at large benefits from a properly created easement burdening the portion of roadway in question.[3] Nor has she ever maintained that either she in particular or the public in general gained title to this disputed property by means of adverse possession[4] or an implied

---

2. The land may contain an easement residing in either the public, *see Watson,* 80 F.Supp. at 651, or a specific individual. The owner may have granted the public or an individual a license to use the land. Alternatively, a covenant allowing the public or an individual to use the land in a specific way may exist in the chain of title. *See generally* R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property* ch. 8 (1984) [hereinafter *The Law of Property*].

3. She would have trouble making such a showing in any event. Nothing in the record indicates that the government granted an express easement to the public when the access road leading to Fort Richardson was first paved. *See The Law of Property, supra* note 2, § 8.3. Moreover, we have no indication that the public made use of this land prior to the time it was acquired by the government such that an easement could be implied, *see id.* § 8.4; and even if prior use were established, appellant would have a difficult time establishing that use of this land is in any way "necessary," *see id.* The only use it is "necessary" for is to get to the heart of the Fort, an area from which nobody seriously disputes the government can exclude outsiders: the record fails to disclose that traversing this roadway is essential in order to get to some public place on the other side of the Fort. *Compare Watson,* 80 F.Supp. at 651 (focusing on necessity of public use of highway to infer that United States acquired land subject to an implied public easement). This lack of necessity

also renders nonexistent the possibility that a so-called easement by necessity arose. *See The Law of Property, supra* note 2, § 8.5.

Finally, even if Vasarajs could prove that the arcane time and use requirements of a prescriptive easement were fulfilled, *see id.* § 8.7, she would face the traditional bar that "prescriptive rights cannot be obtained against the federal government." *See United States v. 1,629.6 Acres of Land,* 503 F.2d 764, 767 (3rd Cir.1974).

4. Indeed, it is a claim she could not make, for adverse possession cannot be achieved against the federal government. *See United States v. Pappas,* 814 F.2d 1342, 1343 n. 3 (9th Cir.1987). An exception exists for claims falling within the Color of Title Act, 43 U.S.C. § 1068(a). *See United States v. Wharton,* 514 F.2d 406, 408 (9th Cir.1975). But this statute is limited by its own terms to "public land." It has no application to land appropriated for purposes other than for public entry. *Beaver v. United States,* 350 F.2d 4, 10 (9th Cir.1965), *cert. denied,* 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966); *see also United States v. O'Donnell,* 303 U.S. 501, 510, 58 S.Ct. 708, 714, 82 L.Ed. 980 (1938) ("It is a familiar principle of public land law that statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose.") (citations omitted). Fort Rich-

dedication.[5]

Nevertheless, there appears to be some authority for the proposition that the government must exercise control over its property in order to preserve the right to exclude others from it pursuant to § 1382. Dictum in *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), supports this view. *See id.* at 685, 105 S.Ct. at 2904 ("The Court [in *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam)] determined ... that the military had abandoned *not only the right to exclude civilian traffic from the avenue*, but also any right to exclude leafleteers.") (citation omitted) (emphasis added);[6] *see also Douglass*, 579 F.2d at 547 (concluding not only that "no easement residing in the public with respect to" a Naval Submarine Base existed, but that the record failed to "reflect any relinquishment of control over the area by the base personnel"); *United States v. Renkoski*, 644 F.Supp. 1065, 1066 (W.D.Mo. 1986) ("Mere title to real estate does not allow issuance by the Government of a 'ban and bar' notice. The area in question must

be controlled."). Consequently, despite our reluctance to do so, we are willing to assume that the government may only bar civilians from the access road if it has exercised actual control over the area. Unfortunately, this assumption fails to help Vasarajs.

Nothing in the record indicates that the government has failed to exercise control over that portion of the Fort on the access road and extending from the guard shack out to the highway. To the contrary, the two signs standing along the side of this disputed stretch of road constitute sufficient evidence of military control, particularly the one warning drivers that "you are subject to search at any time."

**B**

Vasarajs also alleges that she mistakenly believed the boundary of the Fort to be the guard shack and thus did not realize she had entered the Fort upon leaving the highway. She does not build a mistake of fact or law defense around this contention, however.[7] Instead, she claims

---

ardson constitutes land reserved for a specific military purpose. Thus, the Color of Title Act is inapplicable to the instant case.

**5.** For a discussion of dedications, *see The Law of Property, supra* note 2, § 11.6.

**6.** Apart from this dictum, appellant's reliance on the series of cases originating in *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam), is misplaced. These cases involve situations pitting first amendment rights against property rights; they stand for the proposition that once the government opens up an area to the public for speech such that the space becomes a public forum, it cannot bar entry to individuals who wish to enter for speech-related purposes. *See Albertini*, 472 U.S. at 685–86, 105 S.Ct. at 2905–06; *Greer v. Spock*, 424 U.S. 828, 835–36, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976); *Flower*, 407 U.S. at 198–99, 92 S.Ct. at 1843–44. Vasarajs does not argue either that the government issued her bar letter because she had attempted to exercise her first amendment rights or that it removed her from Fort Richardson on March 14, 1987, because she was attempting to engage in expressive activity. Moreover, she has offered no proof that the portion of road in question has become a public forum.

**7.** Nor could she assert such a defense. Generally, a criminal defendant's mistake of fact can

only be a valid defense if it negates the existence of a requisite mens rea component of the crime charged and if the crime allows for the interposition of such a defense. *See United States v. Brooks*, 841 F.2d 268, 269 (9th Cir.), *cert. denied*, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 922 (1988); 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.1 (1986). Even were we to assume that § 1382 allows for a mistake defense, it would certainly fail in Vasarajs' case.

We have previously ruled that the first portion of § 1382, proscribing entry "for any purpose prohibited by law," is not a "specific intent" crime, *United States v. Mowat*, 582 F.2d 1194, 1203–04 (9th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978). This merely means that a defendant can be convicted of it without entering a military reservation with a specific unlawful purpose in mind, such as arson or espionage. *See United States v. Bonilla*, 648 F.2d 1373, 1377 (1st Cir.1981). The portion of § 1382 at issue in the present case proscribes reentry onto a military reservation "after having been removed therefrom or ordered not to reenter" and also does not require specific knowledge. Indeed, the Supreme Court has held that a defendant need not subjectively realize he is violating a bar order in order to be convicted under this portion of § 1382. *See Albertini*, 472 U.S. at 683–84, 105 S.Ct. at 2903–04. On the other hand, it is likely that § 1382

that she did not have fair notice of the boundary of Fort Richardson.[8] As such, Vasarajs' argument taps into the requirement that citizens be provided clear notice of that conduct which is criminally punishable.

■ As a general matter, the so-called "legality principle" mandates that "conduct is not criminal unless forbidden by law which gives advance warning that such conduct is criminal." 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 3.1, at 271 (1986); *see also Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957) (explaining that the notice component of due process limits the rule that ignorance of the law is not an excuse). Thus, the maxim that "ignorance of the law is no excuse for committing a crime ... presupposes a penal statute that adequately puts citizens on notice of what is illegal." *Pope v. Illinois*, 481 U.S. 497, 517, 107 S.Ct. 1918, 1929, 95 L.Ed.2d 439 (1987) (Stevens, J., dissenting). Despite the

fact that most citizens do not keep abreast of every statutory development, that statutes are published and available to the public in the first place means that citizens can fairly be charged with constructive notice of the laws that bind them. *See* Note, Due Process Requirements of Definiteness in Statutes, 62 Harv.L.Rev. 77, 79–80 (1948) [hereinafter Harvard Note] (suggesting that due process requires that statutes be published); *see also* Note, Ignorance of the Law as an Excuse, 86 Colum.L.Rev. 1392, 1408–09 (1986) (noting "the perception that society is justified in demanding that each person make some effort to learn what the law is").[9]

The void-for-vagueness doctrine springs from the legality principle, *see* 1 W. LaFave & A. Scott, *supra*, § 3.1, at 272, and effectively holds that the very words of statutes must be sufficiently precise to provide comprehensible notice to average citizens of the substance of the rules that bind them. *See id.* § 2.3. The Supreme Court has stated that "because we assume that man is

imposes a general intent requirement, such that a defendant must reenter the reservation intentionally, as opposed to accidentally. The Supreme Court was careful not to give the opposite impression in *Albertini, see id.* at 684, 105 S.Ct. at 2904 ("Nor do we decide or suggest that the statute can apply where a person unknowingly or unwillingly reenters a military installation."). Indeed, reentry under § 1382 as an empirical matter will almost always be volitional. Since the statute forbids a person from reentry "after having been removed therefrom or ordered not to reenter," the defendant is in effect warned in advance. Reentry after such warning is overwhelmingly likely to be willful.

Vasarajs' mistake about the exact boundary of Fort Richardson cannot negate the requisite mens rea component of § 1382. For appellant admits that she purposely set out to enter the base and only changed her mind at the guard shack when she saw that cars were being searched. Her intent at the actual point of entry (i.e., the approach road between the exit ramp off the highway and the guard shack) exceeded that which was necessary to sustain a conviction. The magistrate found that the "defendant's efforts to leave Fort Richardson on March 14 were directed toward avoiding the random search in the vicinity of the gate. They were not meant to avoid entering the jurisdiction of the base because of the barment order." The district court affirmed, stating "[i]t is clear that appellant intended to enter the base while traversing the road in question (approach to main gate)." Appellant does not dispute this

finding. Thus, even had Vasarajs understood that the actual boundary of Fort Richardson was at the end of the exit ramp, her intent upon reaching the boundary still would have been to enter the Fort. By the time she changed her mind up near the guard shack, she already had fully committed the crime.

8. We apparently never before have been presented with a defendant convicted of violating § 1382 who claimed she lacked knowledge of a reservation's boundary lines. In past cases the defendant was arrested either after reentering the same part of the base from which he previously had been expelled, *see Trenouth v. United States*, 764 F.2d 1305, 1306 (9th Cir.1985) (truck parking area), or after crossing a clearly marked boundary, *see United States v. Cottier*, 759 F.2d 760, 761 (9th Cir.1985) (8–foot fence bearing warning sign and topped with barbed wire); *Douglass*, 579 F.2d at 547 (a "clearly marked white boundary line").

9. In rare situations, when "circumstances which might move one to inquire as to the necessity [of conducting oneself in a particular manner so as to avoid criminal liability] are completely lacking," *Lambert*, 355 U.S. at 229, 78 S.Ct. at 243, the constructive notice rationale gives way and actual notice is required to sustain a conviction. *See id.* Yet *Lambert* supports the general proposition that where circumstances put one on inquiry notice, the fact that the applicable statute is codified and available to the public satisfies the dictates of due process.

free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *accord Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939); *McSherry v. Block*, 880 F.2d 1049, 1052 (9th Cir.1989); *United States v. Hutson*, 843 F.2d 1232, 1235 (9th Cir.1988). Yet just as the legality principle itself is satisfied by the existence of codified rules that can be sought out and read by enterprising citizens, so too the void-for-vagueness doctrine appears to be satisfied if the words of a statute "suggest[ ] the need to seek legal advice and if the statute's meaning might reasonably be determined through such advice." 1 W. LaFave & A. Scott, *supra*, § 2.3, at 129; *see* Harvard Note, *supra*, at 80 ("In general, it would seem fair to charge the individual with such knowledge of a statute's meaning and applicability as he could obtain through competent legal advice...."). In short, due process does not require that citizens be provided actual notice of all criminal rules and their meanings. The Constitution is satisfied if the necessary information is reasonably obtainable by the public.

The legality principle obviously has been satisfied in this case because Vasarajs' bar order was not only "published," but sent directly to her as well.[10] In short, we need not deem her to have had constructive notice of the bar letter, for it is clear that she had actual notice of the fact that she was forbidden to reenter the Fort. Similarly, the use of the term "Fort Richardson" in the bar order at issue is not so inherently vague as to make the order void-for-vagueness. Yet Vasarajs in effect argues that

due process is also implicated because she was not given sufficient warning of the geographical boundaries of the Fort.

Extrapolating from the legality principle and the void-for-vagueness doctrine, we agree that due process requires that there have been some way for Vasarajs to learn the boundary of the Fort. But this probably does not mean that the government had to provide actual notice to Vasarajs. The possibility that an official description of the Fort's geographical boundaries was available to Vasarajs had she made inquiry of the government would likely satisfy the dictates of due process. Nonetheless, we need not determine the exact parameters demanded by due process in this case because the facts establish that actual notice of the entrance of Fort Richardson was provided to Vasarajs. We hold that the signs posted along the access road leading up to the guard shack adequately announced themselves to Vasarajs as the dividing line between the highway and the Fort. One sign said "Welcome to Fort Richardson," not "Fort Richardson up ahead." The second sign quite bluntly said "You are *now* entering a military reservation, you are subject to search *at any time* " (emphasis added). These signs provided reasonable notice that Vasarajs had left behind civilian territory prior to reaching the guard shack.

C

In light of our determination that Vasarajs had sufficient notice of the Fort's boundary, her contention that she unwillingly passed the guard gate becomes a moot point. For she had already completed her violation of § 1382 when she was ordered to cross the shack.

III

Vasarajs was sentenced to pay a $25 special assessment pursuant to 18 U.S.C. § 3013. The Supreme Court recently reversed our ruling in *United States v. Mu-*

---

**10.** This analysis treats the letter received by Vasarajs as the functional equivalent of a stat-

ute, albeit one written especially for her.

*noz–Flores,* 863 F.2d 654, 661 (9th Cir. 1988), that § 3013 violates the origination clause of the Constitution, art. I, § 7. *See United States v. Munoz–Flores,* —— U.S. ——, —— – ——, 110 S.Ct. 1964, 1972–74, 109 L.Ed.2d 384 (1990). Accordingly, we uphold the district court's imposition of a special assessment on Vasarajs.

AFFIRMED.