Argued and submitted March 25, affirmed May 29, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# DETLEF ALVIN CALLENDER,
*Appellant.*

## 00CR0535; A111288

47 P3d 514

Garrett A. Richardson argued the cause and filed the brief for appellant.

Judy Lucas, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Ann Kelley, Assistant Attorney General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

BREWER, J.

**BREWER, J.**

Defendant appeals from his convictions on four counts of first-degree sexual abuse and one count each of first-degree attempted rape,[1] first-degree sodomy, and second-degree sexual abuse, each offense involving the same victim. Defendant asserts that the trial court erred in denying his motions for judgment of acquittal on the ground that the evidence at trial was insufficient to support a finding that the victim was "mentally defective" and, thus, incapable of consenting to the sexual conduct underlying the crimes for which defendant was convicted. Defendant also contends that the trial court erred in instructing the jury that it should consider the facts and circumstances surrounding the victim's conduct in determining whether she was incapable of consent by reason of mental defect. We affirm.

Because defendant was convicted, we view the evidence in the light most favorable to the state. *State v. Tucker*, 315 Or 321, 325, 845 P2d 904 (1993). At the time of the offenses, the victim was 19 years old, but she had an IQ of only 40 to 47, and her reading and math skills were at a first grade level. On March 10, 2000, the victim spent the night with her friend, Marcie Sichting. The victim slept on the floor of the bedroom, and Sichting and defendant—who was Sichting's boyfriend—slept in a bed in the same room. During the night, the victim awoke to find defendant inserting his finger into her vagina and touching her vagina with his tongue. The victim testified that defendant stopped touching her after Sichting told him to stop. Defendant then spent the rest of the night in the living room, while Sichting and the victim slept in the bedroom. Defendant testified that, before the March 10 incident, Sichting had told him that the victim wanted to have sexual contact with him. However, the victim testified that she had not told anyone, including defendant, that she wanted him to touch her sexually.

On March 19, the victim again spent the night at Sichting's and defendant's home. On that occasion, the victim and Sichting slept in Sichting's bed, and defendant slept on a chair in the living room. During the night, the victim was

---

[1] As a lesser-included offense of the indicted charge of first-degree rape.

awakened by defendant "bit[ing]" her breasts. At some point, defendant also touched the victim's breasts with his hand. The victim told defendant to stop but, once more, he did not stop until Sichting told him to.

Later that evening, defendant again came into the bedroom and sat on the bed near the victim. Defendant removed the victim's pants while she slept. While he was touching her breasts and her vagina, the victim awoke. Defendant also touched the victim's thigh with his penis. The victim believed that defendant tried to put his penis inside of her vagina, "but * * * guess[ed] it didn't work." The victim told defendant to stop, but, again, he stopped only after Sichting told him to.

In connection with the March 10 and March 19 episodes, defendant was charged with six counts of first-degree sexual abuse, ORS 163.427,[2] two counts of first-degree sodomy, ORS 163.405,[3] two counts of first-degree rape, ORS 163.375,[4] and two counts of second-degree sexual abuse, ORS 163.425.[5] Except for second-degree sexual abuse, each of the

---

[2] ORS 163.427(1) provides, in part:

"A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"* * * * *

"(B) The victim is subjected to forcible compulsion by the actor; or

"(C) The victim is incapable of consent by reason of being mentally defective, mentally incapacitated or physically helpless[.]"

[3] ORS 163.405(1) provides, in part:

"A person who engages in deviate sexual intercourse with another person or causes another to engage in deviate sexual intercourse commits the crime of sodomy in the first degree if:

"* * * * *

"(d) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

[4] ORS 163.375(1) provides, in part:

"A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"* * * * *

"(d) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

[5] ORS 163.425(1) provides:

"A person commits the crime of sexual abuse in the second degree when that person subjects another person to sexual intercourse, deviate sexual

charged offenses includes as an element the requirement that the victim must have been incapable of consenting to the sexual conduct by reason of mental defect, mental incapacitation, or physical helplessness, ORS 163.375(1); ORS 163.405(1), or, phrased slightly differently, by reason of being mentally defective, mentally incapacitated, or physically helpless. ORS 163.427(1). With respect to those offenses, the indictment alleged that the victim was incapable of consent by reason of a "mental defect" or being "mentally defective."

At trial, the prosecutor asked the victim several questions relating to her understanding of sex:

"Q:   What—what do you think sex is?

"A:   (no response.)

"Q:   Do you know what it is?

"A:   (no response.)

"Q:   Do you not know what it is, or do you not know how to tell me what it is?

"A:   I don't know how to say it.

"Q:   You don't know how to say it?

"A:   Nope.

"Q:   What—what do you think that it is?

"A:   Sex.

"Q:   Sex is sex? What kind of things can happen when people have sex?

"A:   They can get pregnant.

"Q:   And who can get pregnant?

"A:   Girls.

"Q:   What if a girl doesn't want to get pregnant?

"A:   Um she can have—(not understandable) you call it.

---

intercourse or, except as provided in ORS 163.412, penetration of the vagina, anus or penis with any object other than the penis or mouth of the actor and the victim does not consent thereto."

"Q: Is there something that you can think of that a girl can do if she doesn't want to be pregnant?

"A: If I can just think a minute."

On cross-examination, defendant's counsel asked the victim several questions pertaining to her knowledge and understanding of sex:

"Q: * * * in your opinion, it's what you believe—do you believe you know about sex?

"A: Yes.

"Q: Do you believe that you know how a man and a woman have sex together?

"A: Yes.

"Q: Okay. You know when a man and a woman have sex together, that a man puts his penis inside the vagina?

"A: Yes.

"Q: And you know that when that happens that they can—that the woman can have a baby after that?

"A: Yes.

"Q: And you know that it's good and proper to do that when—when the two people consent and they want to have a relationship together?

"A: Un huh.

"Q: And it might not be so good for that to happen when somebody doesn't want to do it, one of the—one party or the other doesn't want to do it?

"A: Yes.

"Q: And have you ever heard of AIDS?

"A: Yes.

"Q: And do you know that a person could get AIDS from having sex?

"A: Yes."

After the state rested, defendant moved for judgments of acquittal on all counts in which the state alleged

that the victim was incapable of consenting to the sexual conduct because she suffered from a mental defect or was mentally defective. Defendant argued that the victim was not mentally defective because she "understood about the mechanics of sex." On a ground unrelated to the mental defect argument, the court granted defendant's motion for acquittal on one of the sodomy counts, but it denied the motion to acquit with respect to the remaining charges. In doing so, the court reasoned that, "there's something more than understanding the act itself under this statute. * * * There's such [a] thing as understanding the consequences of the act."

At the conclusion of the evidence and arguments, the trial court instructed the jury that being "mentally defective" means that "[a] person suffers from a mental disease or defect that renders the person incapable of appraising the nature of his or her conduct." During deliberations, the jury inquired about the foregoing instruction. In response, the court gave the following supplemental instruction:

> "In deciding whether [the victim] suffers from a mental defect that renders her incapable of appraising the nature of her conduct, you should consider [the victim's] understanding of the sexual acts and of the consequences of the sexual acts by considering all the surrounding facts and circumstances in which the sexual acts occurred."

Defendant's attorney objected to the supplemental instruction on the ground that the victim's understanding of the consequences of the sexual conduct was not relevant to her capability to consent to it. The court declined to reinstruct the jury and, as noted, defendant was convicted on four counts of first-degree sexual abuse, the single remaining first-degree sodomy count, and one count each of first-degree attempted rape and second-degree sexual abuse.

On appeal, defendant first assigns error to the trial court's denial of his motions for judgment of acquittal on the counts requiring proof that the victim was incapable of consenting because she suffered from a mental defect. Defendant argues that the state was required—and failed—to prove that the victim had a "total absence of capacity to

appraise the conduct."[6] The state responds that the evidence showed that the victim was incapable of consent by reason of a "mental defect," notwithstanding that she was aware "that a physical act [wa]s occurring."

**1.** The parties' disagreement as to the proper application of the "mental defect" standard in ORS 163.305(3) poses a problem of statutory construction. When interpreting a statute, we attempt to discern the intent of the legislature by using the methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). In considering statutory text, we give words of common usage their "plain, natural, and ordinary meaning." *Id.* at 611.

ORS 163.315 provides, in part:

"(1) A person is considered incapable of consenting to a sexual act if the person is:

"* * * * *

"(b) Mentally defective[.]"

Being "mentally defective" means that "a person suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person." ORS 163.305(3). Defendant concedes that there was sufficient evidence to prove that the victim suffered from a mental defect. However, he contends that there was no evidence that she was "incapable of appraising the nature of" her conduct as a result of that disease or defect.

---

[6] Defendant also contends that the trial court erred in denying the motions for judgment of acquittal with respect to the sexual abuse and sodomy counts (counts 2, 3, 4, 5, and 7), because those charges did not involve genital sex. Because defendant did not preserve that argument, we do not consider it on appeal. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Additionally, at oral argument, defendant advanced what appeared to be an additional ground for acquittal. Defendant's attorney noted that ORS 163.305(3) provides that a person is mentally defective if the person is "incapable of appraising the nature of [the person's] conduct." Because the state's evidence showed that the victim merely submitted to defendant's acts, defendant's attorney reasoned that the state was required to prove—and failed to do so—that the victim was incapable of appraising the nature of her own limited participation in defendant's conduct. Because that argument also was not preserved, we do not consider it.

The parties do not clearly identify the core of their disagreement as to the meaning of that statutory phrase. Although they focus at various points on the words "incapable" and "appraising," those words do not appear to lie at the heart of the problem. They have fairly straightforward ordinary meanings within the present context. As pertinent here, "incapable" means "not able or fit for the doing or performance: * * * ← of understanding the matter›." *Webster's Third New Int'l Dictionary*, 1141 (unabridged ed 1993). "Appraise," the verb root of the gerund "appraising," means "to judge and analyze the worth, significance or status of." *Id.* at 105. "Appraising" thus involves an evaluative function. However, the scope of that function necessarily depends on the object to which it refers, in this case, the word "nature."

Thus, it is the word "nature" whose meaning is most problematic, because, of all the words in the statutory definition of "mentally defective," its meaning is the least susceptible to precise articulation. As pertinent here, "nature" is defined as "the essential character or constitution of something ‹the ~ of the controversy› ‹inquire into the ~ of heredity * * *›; *esp* : the essence or ultimate form of something." *Id.* at 1507. The dimensions of an "essential character" could be either relatively broad or more narrow, depending on the frame of reference. For example, consistent with the state's view, the "essential character" of conduct plausibly could encompass the social or other nonphysical aspects of the sexual conduct that occurred. Alternatively—as defendant asserts—it could more narrowly refer to the purely physical aspects of the conduct. Neither meaning is necessarily more or less plausible than the other from a textual standpoint.

The context of ORS 163.305(3) also is relevant to our inquiry. *PGE,* 317 Or at 611. As respects each of the offenses at issue, the victim's incapability to consent alternatively could arise from mental incapacity or physical helplessness. *See* ORS 163.375(1)(d), ORS 163.405(1)(d), ORS 163.427(1)(a)(C). Those terms also are defined in ORS 163.305, which provides, in part:

"(4) 'Mentally incapacitated' means that a person is rendered incapable of appraising or controlling the conduct of the person at the time of the alleged offense because of

the influence of a controlled or other intoxicating substance administered to the person without the consent of the person or because of any other act committed upon the person without the consent of the person.

"(5) 'Physically helpless' means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act."

The state argues that, if defendant's construction were to prevail, protection would be given only to persons so intellectually disabled that they are not even conscious that something is happening to them physically. According to the state, that construction would make the term "mentally defective" redundant, because such persons also would be "mentally incapacitated" or "physically helpless." The state asserts that, because we presume that the legislature did not intend to enact redundant statutory alternatives, *FOPPO v. Washington County*, 142 Or App 252, 259, 920 P2d 1141, *rev den* 324 Or 394 (1996), we cannot adopt defendant's interpretation.

We are not persuaded that defendant's reading of ORS 163.305(3) necessarily renders it superfluous in light of ORS 163.305(4) and (5). ORS 163.305(4) addresses persons who are incapable of appraising their conduct due to the administration of a controlled or intoxicating substance or due to some other act committed upon the person; the resulting mental incapacity thus is caused by an extrinsic agent or event and, typically, is temporary. By contrast, even assuming that ORS 163.305(3) relates only to the mental incapacity to appraise the physical or mechanical nature of sexual conduct, the term "mentally defective" indicates that the resulting incapacity is both intrinsic and, typically, permanent.

Similarly, ORS 163.305(5) addresses persons who simply are physically unable to communicate unwillingness to an act, such as by reason of unconsciousness or paralysis, whether temporary or permanent. Again by contrast, and again assuming that ORS 163.305(3) relates only to the incapacity to appraise the physical or mechanical nature of sexual conduct, ORS 163.305(3) addresses persons who, even if physically able to communicate, lack the *mental* capacity to understand that they can or should do so. In short, the state's

contextual redundancy argument fails and, therefore, does not foreclose defendant's interpretation of the statute.

In the end, both parties offer plausible interpretations of the word "nature," one broader and the other more narrow. Because neither we nor the parties have identified any other helpful textual or contextual clues to its meaning, we conclude that it is ambiguous. Accordingly, we turn to the legislative history of ORS 163.305(3). *See PGE*, 317 Or at 611.

**2.** The statute was adopted as part of the 1971 Oregon Criminal Code. We therefore consider the official commentary adopted by the Criminal Law Revision Commission (Commentary) as part of its legislative history. *State v. Chakerian*, 325 Or 370, 378-79, 938 P2d 756 (1997). The Commentary states that the definition of the term "mentally defective" was taken from the Michigan Revised Criminal Code. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report (July 1970), § 104, 104-05. A more extensive discussion of the term is found in the commentary to ORS 163.315:

> "Although the terms which represent these mental states, 'mentally defective,' 'mentally incapacitated' and 'physically helpless' are new to the statutory phraseology of Oregon, the concepts which they describe are not foreign to factors which the law has long recognized as affecting one's capacity to consent.
>
> "* * * * *
>
> "[As pertinent to the phrase "mentally defective,] if this 'defect of understanding' renders a person incapable of appraising the nature of his conduct, he is in law unable to effectively consent.
>
> "The mental capacity required by law to classify a person as 'feeble minded' was discussed in the annotation at 93 *ALR* 918. Under the cases there cited the rule for feeble minded persons was either the lack of mental capacity to know the *right or wrong* of the sexual conduct, *State v. Haner*, 186 Iowa 1259, 173 NW 225 (1919), or so defective as to lack power to give or withhold consent, *Lee v. State*, 43 Tex Crim Rep 285, 64 SW 1047 (1901). The rule stated in the *Haner* decision closely approximates the rule stated in

this draft, whereas the *Lee* rule would in fact abolish the legal conclusion of lack of consent of a mental defective by requiring that no power to consent be present. Such a rule makes the statute superfluous." *Id.* at § 105, 105-07 (emphasis added).

In *Haner*, the defendant was convicted of the crime of having carnal knowledge of an "imbecile."[7] On appeal, the defendant argued that there was insufficient evidence for the jury to find that the alleged victim suffered from an "imbecility of mind * * * as to prevent effectual resistance." In construing the statute, the court concluded:

"[W]e * * * concede that the protection of the law is not restricted to cases of complete or absolute imbecility, but includes as well those who, while having some degree of intellectual power and some capacity for instruction and improvement, are still so far below the normal in mental strength that they can offer no effectual resistance to the approach of those who take advantage of their weakness to have or attempt sexual intercourse with them. This would, of course, include those who by reason of mental inferiority are incapable of knowing or realizing the *moral quality* of their act and are therefore also incapable of giving rational consent." *Haner*, 173 NW at 226 (emphasis added).

Although ORS 163.305(3) is not identical to the statute construed in *Haner*, in defining the term "mentally defective" the Oregon Criminal Code Revision Commission "closely" followed the reasoning of *Haner*. In doing so, the commission necessarily intended, for purposes of ORS 163.305(3), that being capable of appraising the nature of a person's conduct requires more than a mere understanding of the physical aspects of the conduct. Instead, it includes an ability to contemplate and assess the "right or wrong" and the "moral quality" of the conduct.

**3.** In light of that interpretation of ORS 163.305(3), evidence that the victim understood the mechanics of sex did not establish as a matter of law that she was capable of appraising the nature of her conduct and, thus, was not "mentally

---

[7] The Iowa statute provided that, "[i]f any person * * * have such carnal knowledge of an idiot or female naturally of such imbecility of mind or weakness of body as to prevent effectual resistance, he shall be punished." Iowa Code, § 4758 (1919).

defective." Therefore, the trial court's denial of defendant's motions for judgments of acquittal was not in error.

■     In his second assignment of error, defendant asserts that the trial court erred in instructing the jury that it "should consider [the victim's] understanding of the sexual acts and of the consequences of the sexual acts by considering all the surrounding facts and circumstances in which the sexual acts occurred." Reprising the theme of his first assignment of error, defendant argues that the instruction improperly permitted the jury to consider the "moral quality" of the victim's conduct and that "[b]asing a criminal statute's application on community moral opinion * * * creates a dangerous and unconstitutional diversion." We review the court's decision to give the instruction for errors of law. *See State v. Cartwright*, 173 Or App 59, 78, 20 P3d 223 (2001), *rev allowed* 333 Or 399 (2002).

■     The state first responds that at least part of defendant's current argument is unpreserved. As the state correctly observes, at trial, defendant objected only that the supplemental instruction improperly focused on "the consequences of the sexual acts." Defendant did not suggest that the supplemental instruction violated any constitutional provision. We agree with the state that defendant's constitutional argument is not preserved. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000).

■     Moreover, in light of our disposition of his first assignment of error, defendant's remaining argument does not require extended discussion. As we have explained, the inquiry into whether the victim was incapable of appraising the nature of the sexual conduct at issue was not confined to the victim's understanding of the mechanics of that conduct. Accordingly, in instructing the jury regarding its assessment of whether the victim was "incapable of appraising the nature of" her conduct, ORS 163.305(3), the trial court did not err in instructing it to consider the victim's understanding of the consequences of the sexual acts by considering surrounding facts and circumstances.

Affirmed.