**Michael Jon BAILEY, Petitioner–Appellant,**

v.

**Diane RAE, Oregon State Board of Parole and Post Prison Supervision, Chairperson, Respondent–Appellee.**

**No. 02–35144.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 2003.

Filed Aug. 13, 2003.

Anthony D. Bornstein, Assistant Federal Public Defender, Portland, OR, for the petitioner-appellant.

Hardy Myers, Attorney General; Mary H. Williams, Solicitor General; and Steven

R. Powers, Assistant Attorney General, Salem, OR, for the respondent-appellee.

Before: KLEINFELD, McKEOWN, Circuit Judges, and BREYER, District Judge.*

McKEOWN, Circuit Judge.

This petition for writ of habeas corpus presents the question whether a state prosecutor's failure to disclose therapy reports concerning a victim's mental capacity constitutes a due process violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The state criminal convictions at issue, for sexual abuse and sexual penetration, require that the victim be incapable of consent due to a mental defect. Because the reports in question are exculpatory in nature and would have affected the trial in such a way as to undermine our confidence in the jury's verdict, we conclude that a *Brady* violation occurred. Under the circumstances, the state court's decision was both contrary to, and an unreasonable application of, federal law. We reverse the district court's denial of the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a tragic episode involving the sexual abuse of a teenage girl by a trusted family friend and community leader. In March of 1995, fifteen-year-old Rayna Winters discovered a video camera in her bedroom ceiling at her home in Powers, Oregon. The camera was install-

* The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

ed in the attic and contained a scope that extended through a hole in the ceiling. Winters alerted her mother to the camera, and her mother reported the matter to the Children Services Division ("CSD") of the State of Oregon (the "State"). CSD, in turn, contacted the Oregon State Police, and an investigation ensued.

At the time the video camera was discovered, Winters' mother was dating the local Chief of Police, petitioner Michael Jon Bailey. Bailey was living at the Winters' house and became a suspect in the state police investigation. The State, believing Bailey not only installed the video camera but had otherwise sexually abused Winters, eventually charged Bailey with eleven offenses relating to his sexual abuse of Winters. Three of the offenses were predicated upon Winters' alleged inability to consent due to a mental defect. In two counts of the Indictment, the State charged Bailey with sexual penetration with a foreign object, alleging as an element of the offense that Winters was "incapable of consent by reason of mental defect." Or.Rev.Stat. § 163.411.[1] In another count, the State charged Bailey with sexual abuse in the third degree, alleging that Winters was "a person who was mentally defective." Or.Rev.Stat. § 163.415.[2]

Bailey pled not guilty to all counts. Prior to trial, he requested an *in camera* review by the trial court of any CSD files pertaining to Winters. The trial court reviewed the files and ordered disclosure to the defense of certain records but not others. Meanwhile, the State, which had access to the CSD files, submitted a witness list that included Janet Ford, a professional counselor for CSD who had provided therapy to Winters over an extended period as a result of previous sexual abuse. Ford was a potential witness for the purpose of proving that Winters had a mental defect.

Despite Ford's qualifications and contacts with Winters, on the eve of trial the State decided instead to call William Berrian. Berrian, a school psychologist who had evaluated Winters when she was fourteen years old, reported the results of a battery of tests he had conducted to determine Winters' need for continued special education services. Berrian testified that Winters scored a 58 on a standard IQ test, which officially placed her in the "intellectually deficient" range. On a Developmental Test of Visual Motor Integration, Winters scored in the "developmentally delayed" range and was classified as the age equivalent of six years, three months. Based on the results of these and various other tests, Berrian placed Winters in the "intellectually deficient range in the IQ test and severely delayed on the other tests."

The State also called Winters herself as a witness. She testified generally about Bailey's sexual activity with her. On cross-examination, the defense asked Winters a number of related questions, includ-

**1.** Section 163.411 provides, in relevant part, that "a person commits the crime of unlawful sexual penetration in the first degree if the person penetrates the vagina, anus or penis of another with any object other than the penis or mouth of the actor and ... [t]he victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness." Or.Rev.Stat. § 163.411(1)(c).

**2.** Section 163.415 provides, in relevant part, that "[a] person commits the crime of sexual abuse in the third degree if the person subjects another person to sexual contact and: (a) The victim does not consent to the sexual contact; or (b) The victim is incapable of consent by reason of being under 18 years of age." This count was predicated on Winters' inability to consent as required by § 163.415(1)(a) due to her alleged mental defect. A separate count charged Bailey under § 163.415(1)(b) based on the fact that Winters was under the age of eighteen.

ing whether Winters had ever had counseling about sex. Winters replied in the affirmative. Winters also stated that she knows what is "right to do about sex and what is wrong." She stated that this is the reason she refused a request by Bailey to touch him, and that she knew that "that's not something a person is supposed to do."

Bailey was convicted on seven counts, including the two counts he challenges here. The verdicts on the challenged counts were not unanimous. On Count One (sexual penetration), the verdict was ten to two. On Count Eight (sexual abuse), it was eleven to one.

At sentencing it became clear that certain potentially exculpatory documents from the CSD file had not been disclosed to the defense. The court, recognizing that it had not realized their significance upon its initial review, ordered disclosure of the documents. The newly-disclosed material included reports from Ford, the therapist who had previously counseled Winters and was originally listed as a potential witness for the State. One report, completed in January 1994, stated:

> Rayna has made progress in individual therapy regarding the sexual abuse issues. She now knows the difference between 'good' touch and 'uncomfortable' touch and knows she has the right to say 'No' to inappropriate touch. Even though Rayna is developmentally delayed, she now can easily tell what are 'okay' touches or 'not okay' touches with little hesitation.

Another report, completed in March 1994, stated:

> Rayna is developmentally delayed and will continue to be an easy target for further victimization without close supervision by her mother. Rayna does know the difference between 'good touch' and 'uncomfortable touch' and knows she has the right to say 'No' to

inappropriate touch. She also can easily tell the difference between the touches which are okay and those which are not.

According to an affidavit from Bailey's attorney, there were also undisclosed reports from 1992 and 1993, the former of which stated that Winters has "limited ability to protect self" and the latter of which contained evidence that Winters had the capability of distinguishing between right and wrong in sexual matters.

Upon receiving the reports, Bailey filed a supplemental motion for a new trial. He argued that Ford's reports contained important and material new evidence, namely statements that negated the State's allegation that Winters was mentally defective and incapable of consent. After a hearing, the trial court denied the motion, finding that the undisclosed documents were not prejudicial. Bailey appealed. The Oregon Court of Appeals affirmed without a written opinion, and the Oregon Supreme Court denied his petition for review.

Bailey's petition for state post-conviction relief was denied at all levels. He timely filed a federal petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, challenging the validity of his convictions on counts One and Eight based on the State's alleged *Brady* violation. The district court denied the petition.

## II. DISCUSSION

### A. The Standard for Relief Under AEDPA

■■■ We review de novo the district court's denial of Bailey's habeas petition. *See Killian v. Poole,* 282 F.3d 1204, 1207 (9th Cir.2002). In reviewing the state court's decision, we are bound by the standards in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), which states that habeas relief may not be granted by a federal court

unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Because Bailey's challenge involves only a question of law, we review his petition under the "contrary to" and "unreasonable application" clauses of § 2254(d)(1).

■ The Supreme Court recently instructed that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Lockyer v. Andrade,* —— U.S. ——, ——, 123 S.Ct. 1166, 1173, 155 L.Ed.2d 144 (2003) (internal quotation marks omitted). Relief may be granted under the "unreasonable application" clause of § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (internal quotation marks omitted). The state court's application of clearly established Supreme Court precedent must be "objectively unreasonable," not merely incorrect or erroneous. *Id.* Both clauses figure into our analysis here.

Because the Oregon Supreme Court denied review of Bailey's direct appeal and habeas petition without comment, we "look through" the unexplained Supreme Court decisions to the "last reasoned decision . . .

as the basis for the state court's judgment." *Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir.2000). Bailey raised his *Brady* claim both in the state trial court and in his direct appeal. The Oregon Court of Appeals affirmed without a written opinion, and the Oregon Supreme Court denied review without comment. Neither appellate court addressed Bailey's *Brady* claim as part of his petition for post-conviction relief.

Bailey's *Brady* claim was last addressed by the Oregon Circuit Court in Bailey's petition for post-conviction relief.[3] That court rested its decision on the merits, but the parties disagree as to whether we should look to that decision as the basis for the state court judgment. The State argues that the decision constituted the last "reasoned" decision. As Bailey points out, the only apparent reference to the *Brady* issue is a footnote in the post-conviction "Findings and Conclusions of Fact," where the court indicates that Bailey's claim "does not appear to be exculpatory but rather dealt with the victim's ability to be able to recognize inappropriate sexual touching." Because of this elliptical treatment and the ambiguity of its role in the post-conviction court's decision, Bailey argues that we should interpret the state court judgment as resting not on whether the evidence in question was "exculpatory," but rather on the extensive reasoning provided by the trial court in its dismissal of Bailey's Motion for a New Trial. The trial court decision stressed that the evidence in question was not sufficiently prejudicial to constitute a *Brady* violation.

Our practice of "looking through" ambiguous or un-explained state court decisions follows in large part from the Supreme Court's holding in *Ylst v.*

---

**3.** In Oregon, the Circuit Court serves as the state trial court of general jurisdiction. Circuit Courts also review petitions for post-conviction review. Bailey's Motion for a New Trial and petition for state post-conviction relief were therefore both heard at the Circuit Court level, albeit in different judicial districts.

*Nunnemaker,* 501 U.S. 797, 805–06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), where the Court presumed that later unexplained state denials of a petitioner's claim rested on the same procedural default ground as the last "reasoned" decision, thereby precluding federal habeas review. *Id.* The rule consequently has the most impact where it must be determined, at the outset, whether a state court's silent or ambiguous order upholding the rejection of a federal claim on procedural grounds bars federal habeas review altogether. *See, e.g., Lambright v. Stewart,* 241 F.3d 1201, 1205 (9th Cir.2001); *see also Ylst,* 501 U.S. at 801, 111 S.Ct. 2590 (explaining that "[i]f the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available."). Here, it is undisputed that Bailey exhausted his *Brady* claim in the state courts and that federal review is not barred by any state procedural ruling. The question of which state court decision last "explained" the reasons for judgement is therefore relevant only for purposes of determining whether the state court decision was "contrary to" or an "unreasonable application of" clearly established federal law as required by § 2254(d). We need not resolve that question, however, because, as will become apparent in our analysis, Bailey is entitled to relief regardless of which state court decision we review. We thus address whether the final judgment on the *Brady* claim properly rested on a conclusion that the excluded evidence was not "exculpatory" or, alternatively, on the ground that the evidence was not prejudicial, or "material."

## B. Brady Violation

### 1. Elements of a Brady Violation

■ In *Brady,* the Supreme Court held that a defendant's due process rights are violated when the state fails to disclose to the defendant prior to trial "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation. *See United States v. Agurs,* 427 U.S. 97, 107, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). As the Supreme Court has observed, *Brady* and its progeny "illustrate the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

■ To be sure, not every violation of the duty to disclose constitutes a *Brady* violation. In *Strickler,* the Supreme Court reminded us that "there is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." 527 U.S. at 281, 119 S.Ct. 1936 (internal quotation marks omitted). A "true" *Brady* violation therefore occurs only where the State suppressed the evidence, either willfully or inadvertently; the evidence at issue was favorable to the accused, because it is either exculpatory or impeachment material; and the evidence was material to the outcome such that the defendant was prejudiced by the suppression. *Id.* at 281–82, 119 S.Ct. 1936.[4]

---

4. Although *Strickler* had not been decided at the time of the State court's judgment, that case simply articulated principles that were well established at the time the state court reviewed Bailey's *Brady* claim. *See, e.g., Kyles v. Whitley,* 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (review-

## 2. The State Court's Application of the Brady Rule was Both Contrary to Supreme Court Authority and an Unreasonable Application of that Authority

Bailey limits his *Brady* claim to the two convictions based on the victim's mental capacity: unlawful sexual penetration with a foreign object in the first degree and sexual abuse in the third degree. Both crimes, under Oregon law, are predicated on the victim's lack of consent, an element the State alleged was met because Winters suffered from a "mental defect." Bailey's claim centers on the State's non-disclosure of the therapist's reports relating to counseling sessions with the victim for prior sexual abuse in the years leading up to the events in question.

■ The State does not dispute Bailey's contention that the reports were suppressed.[5] We therefore focus on the remaining two elements of a *Brady* claim: whether the suppressed evidence was exculpatory (and therefore favorable to Bailey), and whether it was "material" for *Brady* purposes.

■ We have no trouble concluding that the reports contained exculpatory evidence favorable to Bailey. A central issue at trial, and a critical element of the sexual penetration and sexual abuse charges, was Winters' alleged inability to consent to sexual acts due to a "mental defect." The term "mentally defective," under Oregon law, "means that a person suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person." Or.Rev. Stat. § 163.305(3). As the Oregon courts have clarified, the term encompasses both those who cannot understand the physical nature of the conduct involved, as well as those who cannot properly determine the moral nature of the conduct. *State v. Callender*, 181 Or.App. 636, 47 P.3d 514, 520 (2002). ("[B]eing capable of appraising the nature of a person's conduct requires more than a mere understanding of the physical aspects of the conduct. Instead, it includes an ability to contemplate and assess the 'right or wrong' and the 'moral quality' of the conduct.")

Ford's observations were directly on target. Each report contained a professional analysis of not only Winters' general developmental status and her understanding of physical and moral aspects of physical contact, but also her capacity to consent to improper sexual advances—the linchpin issue presented at trial. The January and March 1994 reports, both of which were prepared after therapy sessions relating to Winters' prior sexual abuse, observed that Winters knew the difference between "good" and "uncomfortable" touches, and that she knew she had the right to say "no" to an "inappropriate" touch. The reports also indicated that, although Winters was "developmentally delayed," she could

ing the requirements and discussing the materiality standard at length); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that "favorable" evidence encompasses both exculpatory and impeachment evidence, and articulating the materiality standard); *Agurs*, 427 U.S. at 107, 96 S.Ct. 2392 (holding there is a duty to disclose regardless of whether the accused has requested the material). We use *Strickler* only as a convenient summary of the elements of a *Brady* violation, acknowledging that, for purposes of our AEDPA analysis, " 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, — U.S. at ——, 123 S.Ct. at 1172.

**5.** The State did not furnish the defense with the documents until after the conclusion of Bailey's trial. Although the state court found no evidence that the State's failure to disclose was intentional, even an inadvertent failure to disclose may constitute a *Brady* violation. *Agurs*, 427 U.S. at 110, 96 S.Ct. 2392.

easily tell the difference between those touches that are "okay" and those that are not. Given the content of these reports, we find it difficult to conceive how Bailey would not have benefitted from this evidence in defending against the State's allegation that Winters was incapable of consent.

The State downplays the exculpatory nature of the evidence by cherry-picking isolated references from the reports. Specifically, the State points to Ford's observation that Winters is "developmentally delayed" and, as a result, continues to be an "easy target for further victimization." We find this approach unavailing. To say that evidence is "exculpatory" does not mean that it benefits the defense in every regard or that the evidence will result in the defendant's acquittal. Rather, the preliminary inquiry in a *Brady* claim has always been whether the evidence in question is "favorable" to the accused. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *see also United States v. Howell*, 231 F.3d 615, 625 (9th Cir.2000) ("That the information withheld may seem inculpatory on its face in no way eliminates or diminishes the government's [*Brady* ] duty . . . ."). The State mistakenly assumes that the passages it references somehow negate the documents' exculpatory nature, when the text of the reports suggests just the opposite. For all the emphasis the State places on Ford's characterization of Winters as "developmentally delayed," the State conveniently ignores Ford's observation that Winters can tell the difference between proper and improper touches *despite* her delayed development.

The reports, taken as a whole, were plainly "favorable" to Bailey given their exculpatory content. To the extent the state court's judgement may have rested on a conclusion to the contrary, that decision is not only wrong but objectively unreasonable. The post-conviction court's observation that the reports in question "do not appear to be exculpatory but rather dealt with the victim's ability to be able to recognize inappropriate sexual touching" is, quite simply, illogical in light of the facts of the case and the statutory elements of the crimes at issue. The State was required to prove that Winters' inability to "appraise" sexual conduct rendered her incapable of consent. The undisclosed reports addressed precisely that question. Whether we take the post-conviction court at its word or attempt to infuse reason into its decision by granting the court the benefit of the State's arguments, the only rational conclusion is that the excluded reports are "exculpatory" material. The state court's conclusion to the contrary was an unreasonable application of Supreme Court precedent.

 The critical issue in any *Brady* claim, and the issue central to the trial court's analysis, was whether Ford's reports were "material" to the outcome of the case-that is, whether the State's failure to disclose Ford's reports resulted in prejudice under *Brady*.[6] Evidence is deemed material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." *Id.* "A 'reasonable probability' does not require showing by a preponder-

---

**6.** The terms "material" and "prejudicial" are frequently used interchangeably to describe the final requirement of a *Brady* violation. "Evidence is not 'material' unless it is 'preju-dicial,' and not 'prejudicial' unless it is 'material.'" *Benn v. Lambert*, 283 F.3d 1040, 1053 n. 9 (9th Cir.2002).

ance that the outcome would have been different." *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir.1997) (en banc) (citing *Kyles v. Whitley*, 514 U.S. 419, 433–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In other words, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

The central issue before the jury was whether Winters had the mental capacity to consent. The only potential witness, other than Winters herself, to address this issue was Ford. Ford was unequivocal in her report that Winters knew right from wrong in terms of sexual touching and that she understood that she "has the right to say 'No' to inappropriate touch." This declaration goes to the heart of Bailey's defense and without this evidence, which was material in addition to being exculpatory, the verdict is not "worthy of confidence." *Id.*

The State's answer to the materiality question is that the suppression of Ford's reports could not have prejudiced Bailey because the reports were merely "cumulative" of testimony given by Winters herself. The trial court embraced this position in rejecting Bailey's Motion for a New Trial, dismissing the discovery of the Ford reports as a non-issue. The court referred specifically to Winters' testimony that she knew what is "right to do about sex and what's wrong;" that this was the reason she refused Bailey's request to touch him; and that she knew that "that's not something a person is supposed to do." The court concluded that the suppressed material was not "such that would give any indication that the Defendant was prejudiced by the lack of having that material" because "the victim herself, in her own words, admitted all the contents of that report." The court, in sum, could not find "any basis" to conclude that the newly discovered evidence "would be such as would change the result if a new trial was granted."

Cumulative evidence is one thing. Unique and relevant evidence offered by a disinterested expert is quite another. By summarily dismissing the Ford reports as cumulative, the state court fundamentally mischaracterized their nature and significance. Setting aside for a moment the substance of the reports, it is implausible that one could equate a statement made by a teenage complainant whom the State has labeled intellectually deficient with a clinical assessment provided by a disinterested professional therapist who had been treating the victim over a period of years. Ford, unlike any witness who testified at Bailey's trial, had met with Winters on several occasions in connection with her prior sexual abuse in the months leading up to the acts in question. She had also evaluated Winters since at least 1993. As a result, Ford was uniquely qualified to report as a neutral observer whether any mental defects suffered by Winters would have rendered her incapable of consenting to the sexual acts at issue. Ford's testimony cannot reasonably be characterized as cumulative. *Cf. Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir.2001) ("Independent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses, and can undermine confidence in a verdict.").

But Ford's evidence would have done more than simply provide the jury with a carbon copy of Winters' testimony. It would have changed the dynamic of Bailey's trial and there is a reasonable probability it would have changed the result on the challenged counts.

Winters' inability to consent by virtue of a mental defect was an element in no less than three of the sexual offenses for which Bailey was charged. Yet the evidence of Winters' mental defect relating to her legal capacity to consent was far from overwhelming. The State's key witness on the issue was Berrian, the psychologist who had conducted a one-time battery of tests to determine whether Winters should continue with special education. Based on these tests, he classified her as "intellectually deficient" in terms of her IQ and "severely delayed on the other tests." But Berrian's testimony went no further. Significantly, none of his testimony related to Winters' mental defects as it related to her ability to say "no" to sexual touching; nor did he testify about her capacity to evaluate the moral nature of sexual conduct, which would have been relevant given the statutory definitions governing the case. See Callender, 47 P.3d at 520 (holding, in the context of a sexual offense, that the statutory definition of "mentally defective" encompasses those incapable of assessing the "right and wrong" or "moral quality" of a person's conduct). Nor did any other expert testify to Winters' capacity to consent to sexual acts.[7]

Ford's reports, by contrast, spoke directly to Winters' ability to evaluate the nature of the sexual conduct involved, and indeed underscored the weakness of Berrian's evidence on that point. The January 1994 Report, for example, observed that "[e]ven though Rayna is developmentally delayed," a point stressed by the State on the basis of Berrian's testimony, "she now can easily tell what are 'okay' touches or 'not okay' touches with little hesitation." The March 1994 Report made the same

observation, noting that Winters "does know the difference between 'good touch' and 'uncomfortable touch' and knows she has the right to say 'No' to inappropriate touch." The State therefore not only suppressed evidence from the expert who was likely most qualified to report on the critical element of consent by reason of mental defect, but also denied the defense the opportunity to cast doubt on the testimony of the State's key witness.

The suppression of the reports is all the more alarming given that the State itself listed Ford as a witness until the eve of trial and then later showcased to the jury the defense's paucity of evidence as to Winters' lack of a mental defect in comparison to its own evidence to the contrary. In its closing argument, the prosecution repeatedly emphasized Winters' low test scores and developmental delays as attested to by Berrian. The defense was left with virtually no evidence to the contrary, leading the State to emphasize to the jury that "all the evidence that the Defense brings out to say that she is not mentally defective ... is that [Bailey] educated her."

As the State points out, we have found materiality lacking where the undisclosed material was cumulative of testimony elicited at trial. But most of the cases cited by the State involved a defendant's attempt to bring in impeachment evidence where the witness in question had already been heavily impeached throughout the trial. See United States v. Croft, 124 F.3d 1109, 1124 (9th Cir.1997); United States v. Marashi, 913 F.2d 724, 732–33 (9th Cir. 1990); United States v. Polizzi, 801 F.2d 1543, 1553 (9th Cir.1986). Even United

---

7. The only other potentially relevant testimony was provided by Karen Evans, a counselor with the State Office for Services to Children and Families (formerly CSD) who met with Winters in March 1995, *after* the events in

question. But Evans, like Berrian, testified primarily as to Winters' developmental delays, and did not testify as to Winters' capacity to consent to sexual acts.

*States v. Manning,* 56 F.3d 1188, 1198 (9th Cir.1995), where we concluded that an investigative report concerning an alternative suspect in a bombing was immaterial, does not assist the State. In *Manning,* the report added nothing of substance to what had already been elicited at trial and the defendant had the opportunity to question two key witnesses, including the investigator, at length about alternate suspects. The cross-examination of the investigator alone took up approximately 250 pages of trial transcript. *See id.* at 1197–98.

The suppression of linchpin evidence leaves us with little confidence in the outcome of Bailey's trial and leads us to conclude that the evidence withheld was material for *Brady* purposes. Although we cannot say with certainty that the jury would have reached a different conclusion on the sexual penetration and sexual abuse charges had the evidence been turned over, there is certainly a "reasonable probability" that it would have done so, which is all that the Supreme Court requires. *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375.

The state court's denial of the *Brady* claim on materiality grounds was not merely in error, but was both "contrary to" and an "unreasonable application of" clearly established Supreme Court precedent. Notwithstanding the particular facts of Bailey's case, the state trial court began its inquiry with the wrong legal standard. The court relied primarily on two state court cases in arriving at the federal standards applicable in a materiality inquiry for *Brady* purposes. The first, *State v. Williams,* 11 Or.App. 255, 500 P.2d 722 (1972), identified the crucial question in a *Brady* inquiry as whether the withheld evidence was "of substantial significance to the defense," adding that the U.S. Supreme Court at that time (i.e., in 1972) had not yet decided the degree of prejudice necessary for relief. *Id.* at 723–24. The trial court paired this case with *State v.*

*Arnold,* 320 Or. 111, 879 P.2d 1272, 1277 (1994), a non-*Brady* case identifying a series of factors setting the standard for granting a new trial based on "newly discovered evidence," including the requirement that the evidence "be such as will probably change the result if a new trial is granted." The trial court ultimately relied on this overly burdensome standard in rejecting Bailey's *Brady* claim, reasoning that Ford's reports could not qualify as material evidence because the court could not find "any basis [to] conclude [the] evidence would be such as would change the result."

The steep hurdle set by the state court runs contrary to the materiality test that has been set out by the Supreme Court. In *Bagley,* the Court explained that evidence is material if there is a "reasonable probability" that a different outcome would have occurred had the evidence been disclosed, meaning that there was a "probability sufficient to undermine confidence in the outcome." 473 U.S. at 682, 105 S.Ct. 3375. The Court, in arriving at the standard, made a point of distinguishing the stricter "newly discovered evidence" standard of the type applied by the Oregon state court. *See id.* at 680, 105 S.Ct. 3375 (explaining that the Court had previously "rejected a standard that would require the defendant to demonstrate that the evidence if disclosed *probably* would have resulted in acquittal" (emphasis added)). *Kyles* echoed this distinction, observing that "*Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important." 514 U.S. at 434, 115 S.Ct. 1555. The application of a "more probable than not" standard of the type applied by the state court is "contrary to" clear Supreme Court precedent.

The state court's denial of the *Brady* claim was also objectively "unreasonable"

in light of the facts and circumstances of this case. Notwithstanding the strict materiality standard that was applied, we are troubled by the fact that the court "did not undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Boss,* 263 F.3d at 745. The state court's analysis of prejudice amounted to little more than a blanket assumption that, because Ford's reports were cumulative, they would have had little impact on the trial's outcome. Like the Seventh Circuit, we conclude that the Supreme Court's *Brady* jurisprudence requires more than simply labeling the evidence as cumulative without placing it in context. *See id.* (citing *Kyles,* 514 U.S. at 441–45, 115 S.Ct. 1555, for the position that courts must conduct a careful assessment of the suppressed evidence in light of the evidence produced at trial).

Bailey has demonstrated that his due process rights were violated under *Brady* and that he satisfies the standard for habeas relief under 28 U.S.C. § 2254. The district court erred in denying the writ for habeas corpus. We accordingly REVERSE the district court's judgment and REMAND the case with instructions to grant Bailey's writ of habeas corpus.

**REVERSED AND REMANDED.**