**Kevin Wayne ANDERSON, Petitioner–Appellant,**

v.

**Mitch MORROW, Superintendent, Oregon State Correctional Institution, Respondent–Appellee.**

No. 02–35675.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 2003.

Filed June 7, 2004.

Thomas J. Hester, Assistant Federal Public Defender, Portland, OR, for the petitioner-appellant.

Kathleen Cegla, Assistant Attorney General, Salem, OR, for the respondent-appellee.

Appeal from the United States District Court for the District of Oregon; Ancer L. Haggerty, District Judge, Presiding. D.C. No. CV–99–00512–HA.

Before: GOODWIN, HUG, and BERZON, Circuit Judges.

GOODWIN, Circuit Judge:

Kevin Anderson was convicted in 1993 of first-degree rape and sodomy under Oregon laws that prohibit having sexual intercourse with a person "incapable of consent by reason of mental defect." Or.Rev.Stat. §§ 163.375, 163.405 (the "sex crimes statutes"). He appeals the denial of his petition for a writ of habeas corpus brought under 28 U.S.C. § 2254. He urges two points: (1) the trial court unconstitutionally excluded evidence of the victim's sexual history and reputation under Oregon's rape shield law; (2) the State of Oregon convicted him under an unconstitutionally vague statute. Neither point has merit, and we affirm.

## I. Background

The facts of the case were largely undisputed at trial. The victim (hereinafter "JH") is a 28 year-old moderately retarded woman. Psychiatric evaluators have placed her level of emotional maturity at the six- to eight-year-old level; her communication skills at the five- to seven-year-old level; her adaptive functioning level in the "severely retarded range"; and her overall intellectual functioning level in the "moderately retarded range." Her hearing, vision, and speech are impaired.

In the past, JH had had two steady relationships with men that involved some sexual activity. Anderson testified that he had seen JH dancing "suggestively" with men at bars. He had noticed that JH had difficulty speaking and surmised "that maybe her tongue was missing or some part of her tongue." Anderson further testified that the sexual encounter at issue here was not their first; he stated that JH had initiated sexual intercourse on one prior occasion. Anderson claimed that the second sexual encounter, which resulted in his arrest and conviction and this appeal, was consensual, and that JH again initiated intercourse.

Before trial, Anderson filed a motion to offer evidence of JH's sexual history and reputation to rebut the State's allegation that by reason of mental defect she was incapable of consenting to sexual intercourse. The evidence consisted primarily of statements from various individuals describing her sexual history, purported promiscuity, and public displays of sexual acts. The trial court allowed some evidence of JH's sexual history (specifically her sexual activity with former boyfriends and the previous encounter with Anderson), but excluded reputation testimony and observations of her behavior that failed to shed light on her ability to

consent or Anderson's perception of her ability to consent.

The jury convicted Anderson, and he appealed to the Oregon Court of Appeals, challenging the evidence exclusion and arguing that the sex crimes statutes were unconstitutionally vague. The Court of Appeals rejected Anderson's evidence argument and refused to rule on the vagueness claim. The Oregon Supreme Court denied review. Anderson's petition for post-conviction relief at the state level was unsuccessful, as was his federal habeas petition at the district court.

## II. Discussion

### A. Evidentiary Rulings

Anderson challenges as constitutionally flawed the trial court's exclusion of graphic evidence of JH's sexual history. Oregon Evidence Rule 412 states that evidence of the past sexual behavior of an alleged victim such crime is not admissible unless it (a) relates to the motive or bias of the alleged victim; (b) is necessary to rebut or explain scientific or medical evidence offered by the state; or (c) is otherwise constitutionally required. Or.Rev.Stat. § 40.210, (2)(b).

Taking this rule into account, the trial court admitted evidence of JH's sexual activity with at least two other men, her previous sexual encounter with Anderson, and testimony of witnesses who described her public acts of seductive behavior. The court excluded the following: testimony that JH was a "cat in heat"; reports from a counselor who worked with JH "to try to resolve problems with her sexuality"; testimony from her former boyfriend who described her sexual drive as "excessive"; testimony from two community members recounting how they witnessed JH rubbing her body against men, grabbing their crotches, and picking up men on street corners.

The trial court exercised proper discretion in limiting the more defamatory evidence. In *Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the Supreme Court held that the right to present relevant testimony ... may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 149, 111 S.Ct. 1743 (internal quotation marks and citations omitted). A state passing a rape shield law makes a "valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." (*Wood v. Alaska,* 957 F.2d 1544, 1552 (9th Cir.1992) (quoting *Lucas,* 500 U.S. at 150, 111 S.Ct. 1743)).

Here, the court admitted evidence of JH's prior sexual experience, testimony that she received sexual counseling, and other testimony regarding her public displays of sexual affection. It refused to admit evidence of a more demeaning nature that characterized JH as a wanton and promiscuous woman. The court's evidentiary rulings properly balanced Anderson's right to inform the jury of JH's past sexual activity (evidence that was relevant to his affirmative defense and to JH's ability to consent) against the importance of protecting her from unnecessary invasions of privacy.

### B. Statutory Vagueness Claim

#### 1. Procedural Default

In addition to his evidentiary claim, Anderson argues on appeal that he was prosecuted under unconstitutionally vague criminal statutes. Because Anderson did not raise this claim at trial, the district court ruled the claim procedurally defaulted under *Palmer v. State of Oregon,* 318 Or. 352, 867 P.2d 1368 (1994) (hereinafter "*Palmer II* "), and did not rule on its merits. "[T]o constitute adequate and in-

dependent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and *well-established* at the time of petitioner's purported default." *Lambright v. Stewart,* 241 F.3d 1201, 1203 (9th Cir.2001) (emphasis in original) (citations omitted).

Under Oregon's post-conviction statute, a defendant's failure to raise a matter at trial "shall not affect the availability of [post-conviction] relief." Or.Rev.Stat. § 138.550(1). In *Palmer II,* the Oregon Supreme Court interpreted this statute to mean that a defendant could not raise an issue during post-conviction proceedings that was not raised at trial, unless the defendant also asserted an inadequate assistance of counsel claim. *See* 318 Or. at 354, 867 P.2d 1368. Although *Palmer II* is the prevailing law in Oregon and we do not question its current validity, it does not apply to bar claims in this appeal.

The district court's ruling was in error. Anderson's purported default occurred *before* the state supreme court decided *Palmer II.* At the time of Anderson's purported default, *Palmer v. State of Oregon,* 121 Or.App. 377, 854 P.2d 955 (1993) (hereinafter *"Palmer I"*), was controlling law. In that case, the Oregon Court of Appeals held that:

> Nothing in [the post-conviction statute] requires petitioner to establish that trial or appellate counsel were inadequate in order to raise a constitutional challenge to the criminal statute for the first time in post-conviction proceedings.

*Palmer I,* 121 Or.App. at 383–84, 854 P.2d 955. The Oregon Supreme Court later reversed this decision in *Palmer II* but only after Anderson's trial.

The respondent urges this court to hold that at the time of Anderson's trial, the prevailing, established rule was that a defendant could not raise an issue during post-conviction proceedings that he did not raise at trial. The respondent's argument

fails. The holding in *Palmer I* indicates the rule was not clear or consistently applied. Although the Oregon Supreme Court had issued a holding similar to *Palmer II* in *North v. Cupp,* 254 Or. 451, 461 P.2d 271 (1969), the *North* holding was unevenly applied. Cases cited by the respondent to prove that the *North* and *Palmer II* rule was well-established at the time of Anderson's trial are not on point. *See Ailes v. Portland Meadows, Inc.,* 312 Or. 376, 382, 823 P.2d 956 (1991) (stating that a district court has discretion to review unpreserved errors but must articulate its reasons for doing so); *Reynolds v. Cupp,* 71 Or.App. 571, 692 P.2d 648 (1984) (holding that an issue that was not and could not reasonably have been raised on direct appeal could not form the basis of post-conviction relief).

We hold that Anderson's vagueness claim is not procedurally defaulted, and we now turn to its merits.

### 2. Statutory Defect

■ "A statute is void for vagueness if it fails to 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement.'" *Free Speech Coalition v. Reno,* 198 F.3d 1083, 1095 (9th Cir.1999) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)); *see Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Anderson contends that the statutes under which he was prosecuted are unconstitutionally vague because they fail both to provide fair notice of the prohibited conduct and to prevent arbitrary and discriminatory enforcement.

### a. Notice Test

■ The notice test of vagueness looks at the "very words" of the statute in ques-

tion to determine whether the statutory language is "sufficiently precise to provide comprehensible notice" of the prohibited conduct. *United States v. Vasarajs*, 908 F.2d 443, 448 (9th Cir.1990). The ordinary person must understand what conduct is prohibited; he must not be "left guessing about what is prohibited and what is not." *Free Speech Coalition*, 198 F.3d at 1095.

■ Anderson bases his notice argument on his belief that JH consented to sexual intercourse. Anderson claims that he had no reason to believe his consensual acts with JH were illegal because he observed her appearing "real loose" and "quite experienced" on previous occasions. Anderson's mistaken evaluation of JH's ability to consent to sexual intercourse has no bearing on whether Oregon's sex crimes statute is vague and thus unconstitutional. The sex crimes statute is clear on what it prohibits: sexual intercourse with a person "incapable of consent by reason of mental defect." Or.Rev.Stat. §§ 163.375, 163.405.

The proper place for Anderson's scienter argument was at trial, in the form of an affirmative defense. *See State v. Phelps*, 141 Or.App. 555, 920 P.2d 1098, 1100 (Ct.App.1996). Anderson raised this defense and the jury rejected it. His attempt to revive it here does not aid his vagueness challenge.

#### b. Arbitrary Enforcement Test

■ A statute is vague if it does not provide explicit standards to those who apply them, so as to avoid arbitrary and discriminatory enforcement. *United States v. Harris*, 185 F.3d 999, 1004 (9th Cir.1999). Anderson contends that Oregon's sex crimes statutes are so vague that they permit arbitrary enforcement by police officers, prosecutors, and fact-finders. The statute is not vague. It gives law enforcement officials clear standards on conduct that must be prosecuted.

Anderson does not argue that the language of the statute lacks precision or definiteness in a way that "allows law enforcement officials to exercise their discretion." *Free Speech Coalition*, 198 F.3d at 1095. Instead, he claims that the State arbitrarily chose to prosecute him alone, and none of JH's other sexual partners. Anderson's argument relied in part on statements made by the prosecutor during an evidentiary hearing. The prosecutor described limited circumstances under which the State might not prosecute an individual for having sexual intercourse with JH—for example, a healthy, long-term relationship condoned by her mother. According to Anderson, such statements demonstrate that Oregon's statutory scheme encourages arbitrary enforcement by law officials.

Anderson's argument sounds in selective prosecution, rather than an arbitrary enforcement. Because Anderson did not raise a selective prosecution claim at any point during his trial, direct appeal, post-conviction proceedings, and habeas challenge, we decline to consider the claim in the present habeas appeal.

Anderson's vagueness challenge fails on the merits.

#### 3. Implications of *Lawrence v. Texas*

At oral argument, Anderson argued that the recent Supreme Court holding in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), established a new constitutional right that compelled us to remand this case to the district court for reconsideration of the statutory vagueness claim. We address *Lawrence* only so far as to state that it has no impact on Anderson's vagueness claim. The *Lawrence* Court held that the Due Process Clause of the Fourteenth Amendment protects the right of two individuals to engage in fully and mutually consensual private

sexual conduct. The holding does not affect a state's legitimate interest and indeed, duty, to interpose when consent is in doubt. Anderson's reference to *Lawrence* at argument does not alter his vagueness claim or create a new "*Lawrence*-based vagueness claim" that must be, newly exhausted in the district court, as the dissent suggests.

Nor in the context of this case does *Lawrence* satisfy the *Teague v. Lane,* 489 U.S. 288, 307, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), substantive exception allowing for retroactive application of a new rule. The Supreme Court did place "certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe," *id.,* but not the conduct in this case.

## III. Conclusion

While the district court erred by ruling that Anderson had procedurally defaulted his vagueness challenge, we affirm the denial of the petition because the statutory scheme under which he was prosecuted was not unconstitutionally vague. Anderson's evidentiary objections raise no substantial federal question. No other constitutional defects in the prosecution or in the trial have been preserved in this record.

BERZON, Circuit Judge, concurring in part and dissenting in part:

Weighty state and personal liberty interests are placed at issue by an extremely important question raised at oral argument in this case: does the Supreme Court's recent decision in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), which created a substantive due process right to private consensual sex, have any bearing on the precision with which the government must act when criminalizing an otherwise consensual sexual act on the ground that the sex partner is too retarded to consent to sexu-

al contact? Although the panel reaches the issue, procedural obstacles and prudential considerations militate against doing so. Serious constitutional questions such as this one should not be decided after 90 seconds of oral argument presentation, on appeal from denial of federal habeas relief. I respectfully dissent, principally from the majority's decision to reach this issue but, because they have determined to decide it, from the majority's treatment on the merits of Anderson's *Lawrence* argument as well.

### I.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, 110 Stat. 1214, provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....

28 U.S.C. § 2254.

The majority is apparently proceeding on the assumption—although it does not say so expressly—that Anderson's *Lawrence* claim "was adjudicated on the merits in State court proceedings" as part of the general vagueness claim. Nowhere does the majority indicate that Anderson's *Lawrence*-based vagueness claim is unexhausted.

That being the case, the question posed by AEDPA is: was the state court adjudication of Anderson's vagueness claim "contrary to," or "an unreasonable application

of," clearly established Supreme Court law *at the time of the relevant state court decision? See, e.g., Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (" 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision"); *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Of course, *Lawrence v. Texas* was not "clearly established Federal law" on November 18, 1998, the day the Oregon Supreme Court summarily affirmed the denial of Anderson's state habeas petition. Rather, *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), was the law in November 1998, and that case limited the contours of the substantive due process right that Anderson seeks to invoke here to "family, marriage, [and] procreation," none of which is implicated in this case. *Id.* at 191, 106 S.Ct. 2841 ("any claim that [the prior substantive due process] cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable").

 As is apparent, no case decided after November 1998, *Lawrence* included, has any bearing on the question whether Anderson is entitled to habeas relief under 28 U.S.C. § 2254(d)(1) based on the proceedings thus far conducted in state court. The majority therefore has no justification for deciding the *Lawrence* question on the merits if it is part of the exhausted vague-ness issue, given the procedural posture of this case.[1]

## II.

The other possibility is that the majority does not view the *Lawrence* variant as part of the exhausted vagueness issue but is deciding it anyway. That approach also has little to commend it. There are three vastly preferable alternatives.

First, the majority could have simply ruled the *Lawrence* claim unexhausted under AEDPA and declined to decide it. As the majority rejects the *Lawrence* claim, it is technically proper to forgo requiring exhaustion, as AEDPA so permits. *See* § 2254(b)(3). But surely, where, as here, the legal question is both novel and important, and has not been briefed in *any* court, both prudence and fairness dictate against such a precipitous course. Application of § 2254(b)(3) should be reserved for circumstances in which the result on the unexhausted claim is a forgone conclusion, not open to any dispute. Absent that circumstance, deciding an issue not litigated in the state courts is in tension with comity principles, as the state court may view the issue differently than we do.

Second, Anderson never raised a separate *Lawrence* claim before the district court. Thus, if the majority thought the *Lawrence* issue, although unexhausted, was properly raised in this appeal, a remand to allow the district court first to address the question would have been appropriate. Again, such a tack was not required. Appellate courts are entitled to decide pure questions of law not raised

---

**1.** By contrast, Anderson's *Lawrence* claim is not barred by the doctrine of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Lawrence* falls quite cleanly into the first *Teague* exception, because, by striking down Texas' sodomy law, it placed "certain kinds of primary, private individual con-duct beyond the power of the criminal law-making authority to proscribe." *Id.* at 307, 109 S.Ct. 1060. Section 2254(d) and *Teague,* however, are independent barriers to habeas relief. *See Horn v. Banks,* 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).

below, if doing so does not prejudice the opposing party. *See, e.g., Ellis v. City of San Diego,* 176 F.3d 1183, 1191 n. 6 (9th Cir.1999). Nonetheless, reaching the merits of this complicated and important issue was not the more prudent path.

Third—and this would be my preferred approach—the court could remand the case to the district court with directions to stay proceedings while Anderson exhausts the *Lawrence*-based vagueness claim.

The *Lawrence* issue was raised for the first time at oral argument. We cannot fairly blame Anderson for tardiness, however. The Supreme Court's decision in *Lawrence* was announced less than two weeks prior to oral argument, well after the close of briefing, and *Lawrence* expressly overruled prior precedent. 123 S.Ct. at 2484 (*"Bowers v. Hardwick* should be and now is overruled.").

AEDPA requires a habeas petitioner to exhaust each of his federal claims in state court, making no exception for claims precipitated by new law decided by the Supreme Court after the relevant state court adjudication on the merits. 28 U.S.C. §§ 2254(b) & (c); *see also, e.g., Gatlin v. Madding,* 189 F.3d 882, 887 (9th Cir.1999) ("It is not sufficient to raise only the facts supporting the claim; rather, the constitutional claim inherent in those facts must be brought to the attention of the state court.") (internal quotation marks and citations omitted).

Anderson did not attempt to invoke before *any* of the Oregon courts a vagueness argument premised on a federal constitutional right of consenting, unmarried adults to engage privately in sexual conduct. It would therefore be proper, if one views the *Lawrence* claim as unexhausted, to remand the *Lawrence*-based claim to the district court so that leave to exhaust the claim through an Oregon post-conviction procedure might be granted.

*Kelly v. Small,* 315 F.3d 1063, 1070 (9th Cir.2003), held that a district court should ordinarily both permit a prisoner who filed a mixed petition, one raising both exhausted and unexhausted claims, to dismiss the unexhausted claims, and entertain a motion for a stay pending presentation of the unexhausted claims to an appropriate state court.[2] I have found no case authorizing or prohibiting a district court from employing this procedure when the Supreme Court decision giving rise to the claim had not yet issued at the time the state courts were adjudicating his claims.

*Tyler v. Cain,* 533 U.S. 656, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001), supports, albeit indirectly, the conclusion that new law announced while a case is pending on habeas can be pertinent to deciding the habeas petition. In *Tyler,* putting to one side Justice O'Connor's concurrence, *id.* at 668–70, 121 S.Ct. 2478, four Supreme Court Justices interpreted 28 U.S.C. § 2244(b)(2)(A) to prevent a prisoner raising a successive habeas petition from relying on a new rule of law unless the Court "held" the rule to be retroactive in a prior habeas case. *Id.* at 664–68, 121 S.Ct. 2478 ("We cannot decide today whether *Cage* is retroactive to cases on collateral review, because that decision would not help Tyler in this case. Any statement on *Cage's*

2. An aspect of the doctrine applied in *Kelly v. Small* is currently undergoing Supreme Court review in *Pliler v. Ford,* —— U.S. ——, 124 S.Ct. 981, 157 L.Ed.2d 811 (2004) (granting writ of certiorari to review *Ford v. Hubbard,* 330 F.3d 1086 (9th Cir.2003)). I proceed under the assumption that the most basic form of the procedure fleshed out in *Kelly*—a permissive stay by a district court to allow for exhaustion of unexhausted claims in a mixed petition—will remain in effect, that procedure having been expressly recognized as appropriate in *Stewart v. Martinez–Villareal,* 523 U.S. 637, 644–45, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998).

retroactivity would be dictum. . . ."). If that is so, the only way for the Court *initially* to hold a new rule to be retroactive, such that future habeas petitioners would be able to take advantage of it on a successive petition, would be on a first petition. Even on a first petition, however, the Court would be unable to "hold" a new rule to be retroactive unless the rule was previously unavailable.

Section § 2254(e)(2) also envisions the existence of a habeas claim that relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" but, unlike § 2244(b)(2)(A), is not limited to successive petitions.³ Section 2254(e)(2) provides that if, on a first federal petition, an applicant raises issues based on a retroactively applicable new rule, the federal court should not hold an evidentiary hearing unless "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2254(e)(2)(B). The necessary negative implication of that provision is that federal habeas petitioners *may* raise on federal habeas issues based on such new rules of constitutional law, although they must generally do so on the basis of the existing state court record.

Federal habeas relief can therefore *sometimes* be granted on the basis of claims that rely on new Supreme Court decisions, as long as the claim was exhausted in state court. A habeas petitioner raising a claim that relies on new Supreme Court law, announced while the federal habeas is pending and raising purely legal issues, should therefore be permitted to return to state court to exhaust his claim through an appropriate state court post-conviction procedure.⁴

That Anderson's *Lawrence*-based claim only originated *after* his case left the district court's jurisdiction and entered ours does not change this conclusion. AEDPA's exhaustion requirement entitles a state to pass on a prisoner's federal claims before the federal courts do so. A state has no interest, however, in seeing that the prisoner's ability to invoke new Supreme Court law in a first habeas petition expires upon the filing of a notice of appeal from a federal district court's ruling, rather than at the time that his first petition has been conclusively ruled on by the federal courts. To require instead that Anderson raise his *Lawrence* claim in a second habeas petition would, because of the severe limitations on second petitions, *see, e.g., Tyler,*

---

**3.** I note that Justice O'Connor's controlling concurrence in *Tyler* suggests that this is precisely the type of case involving a claim that relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." As Justice Breyer stated in his dissent:

> I agree with Justice O'Connor—as does a majority of the Court—when (in describing [the first] *Teague* exception) she says that "[w]hen the Court holds as a new rule in a subsequent case that a particular species of primary, private individual conduct is beyond the power of the criminal lawmaking authority to proscribe, it necessarily follows that this Court has 'made' that new rule retroactive to cases on collateral review."

533 U.S. at 675 (citation to Justice O'Connor's concurrence omitted). As explained above, *Lawrence* falls within *Teague's* first exception. *See supra* note 1.

**4.** Importantly, not every new Supreme Court decision will warrant reexhaustion under the procedure I propose. Section 2244(b)(2)(A) and § 2254(e)(2)(A) explicitly require that the claim invoking the new Supreme Court decision be "previously unavailable." While groundbreaking cases, overruling prior precedents, such as *Lawrence* will generally give rise to claims that were "previously unavailable," many new Supreme Court decisions will not.

533 U.S. at 667–68, 121 S.Ct. 2478, result in precluding entirely consideration of issues that, under the normal rules governing review within the federal courts, we would consider even if first raised on appeal because only purely legal issues are involved. *See Ellis,* 176 F.3d at 1191 n. 6

I would therefore remand to the district court with instructions to stay proceedings while the *Lawrence*-based vagueness claim is exhausted in state court.

### III.

Because the majority nonetheless reaches the *Lawrence* issue on the merits, I do as well.

The only analysis the majority offers as to why *Lawrence* does not impact the vagueness inquiry in this case is the following assertion:

> The *Lawrence* Court held that the Due Process Clause of the Fourteenth Amendment protects the right of two individuals to engage in fully and mutually consensual private sexual conduct. The holding does not affect a state's legitimate interest and indeed, duty, to interpose when consent is in doubt.

*Ante* at 1032–33.

It is true that *Lawrence* did not involve a case where consent was in doubt. *Lawrence* explicitly said as much: "[The present case] does not involve persons who might be injured or coerced or who are situated in relationships were consent might not easily be refused." 123 S.Ct. at 2484. But that distinction does not conclusively decide this case. The Supreme Court was simply making clear what could just as well have gone unsaid—that the Court expresses no view as to issues not before it. On habeas, the question remains—or would remain, had the state court had an opportunity to address *Lawrence*[5]—whether declining to acknowledge that Anderson's case implicates the right established in *Lawrence* is "unreasonable," § 2254(d)(1), given that the Supreme Court has not directly addressed the current circumstances. *See Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495 (noting that a "state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law,' " and equating an unreasonable extension of a legal principle to a new context with an unreasonable refusal to extend an established principle to a new context).

What follows is my explanation as to why the sexual liberty interest set out in *Lawrence v. Texas* does indeed implicate the validity of Anderson's conviction.

### A. Background

As the facts provided by the majority are sparse, I spell out the factual background in a bit more detail:

At the time of the sexual encounter for which Anderson was prosecuted, JH was 26 years old and lived with her mother. She is 4′7″ tall, has the emotional maturity of a 6—8-year-old child, and is moderately mentally retarded. She has "a little" vision in one eye, and "fairly good" vision in the other. She also has a hearing deficiency but does not always wear a hearing aid. It is difficult to understand her speech.

---

**5.** The need for this counterfactual assumption confirms that we should have allowed the state courts to address the question in the first instance. Asking whether a state court decision is an "unreasonable" application of clearly established Supreme Court law when there was no chance for the state courts to address the new law distorts AEDPA's federalism premises. The alternative, deciding on the merits, without § 2254(d)(1) deference, an unexhausted, nonfrivolous question is similarly at odds with comity principles.

As an adult, JH has had at least two boyfriends with whom she had sexual relationships. After both relationships had ended, with one former boyfriend she "continued a sexual relationship . . . a couple of times a year." She has also received counseling at the Benton County Mental Health Center, where she learned about using condoms. Prosecution experts testified that, "She understands that a man is on top and the woman is on the bottom and the penis is inserted into the vagina," and that she understands the health and pregnancy risks of not using condoms, but that she does not understand dating norms, such as the circumstances in which kissing or holding hands is appropriate dating behavior.

Others also testified as to JH's sexual behavior. Anderson's wife testified that in June 1993, roughly one year after the sexual encounter for which Anderson was prosecuted, she witnessed JH display to a mutual friend six hickeys that she had received on her neck. JH exhibited happiness about the marks. Also, Tina Pahre, an acquaintance of Anderson's, testified that in 1992 she had frequently seen JH at Pahre's apartment complex. JH's apparent purpose was to visit a man named Jim, who "[s]he seemed to really, really like." According to Pahr, even when Jim was not there, JH would visit other men at the apartment complex, "follow them up to their apartment . . . [e]ven if they didn't want her there . . . and flirt with them." This behavior continued for a month.

Additionally, Anderson testified at trial about a 1989 consensual sexual encounter with JH, for which he was not prosecuted.

The 1992 sexual encounter for which Anderson was prosecuted began when Anderson saw JH as he was driving home from work. JH was walking home from a bar where she had been dancing, an activity in which she regularly engaged, and drinking. Anderson claims that she accepted a ride with him and that they proceeded to a secluded parking lot. According to him, they conversed about their previous intimate relationships. While he suspected that she might be deaf, he maintained that he did not realize that she was mentally retarded. Anderson claims that JH initiated the consensual sexual encounter that followed.

JH's testimony, which mostly consisted of her affirmations of the prosecutor's leading questions, was that Anderson grabbed her by the arm and told her to get into the car. She also testified that Anderson was drinking, that Anderson removed her pants despite her protest, and that he forcibly raped and sodomized her. The medical examiner testified that JH suffered no bruising or injuries anywhere on her body.

Anderson was charged with five counts of criminal conduct: (1) kidnapping, (2) forcible rape, (3) rape of "a person who was incapable of consent by reason of mental defect," (4) forcible sodomy, and (5) sodomy of "a person who was incapable of consent by reason of mental defect." The jury acquitted him of Counts I, II, and IV. Thus, the jury *rejected* JH's version of the incident, as it concluded there was no forcible rape or sodomy. Instead, the basis for Anderson's conviction was non-forcible sexual activity with a person legally incapable of consent.

The statutory scheme under which Anderson was convicted provides:

(1) A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

. . .

(d) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness.

OR. REV. STAT. § 163.375. Additionally, "Mentally defective" means that a person suffers from a mental disease or

defect that renders the person incapable of appraising the nature of the conduct of the person.

OR. REV. STAT. § 163.305(3). As the trial judge made clear in Anderson's case, the applicable intent requirement, knowledge, extends only to knowingly having sexual intercourse. A defendant need *not* have known that his sexual partner was incapable of consent by reason of a mental defect. *See State v. Phelps*, 141 Or.App. 555, 920 P.2d 1098, 1100 (Ct.App.1996).

There is, however, an affirmative defense:

> [I]t is an affirmative defense for the defendant to prove that at the time of the alleged offense the defendant did not know of the facts or conditions responsible for the victim's incapacity to consent.

OR. REV. STAT. § 163.325(3). The defendant bears the burden of proof as to this defense, *see Phelps*, 920 P.2d at 1100, which is limited to not knowing the facts and conditions responsible for the incapacity to consent. It is not a defense that the defendant was unaware of the incapacity to consent as a result of those facts or conditions. Thus, if Anderson knew that JH was retarded, the defense fails, whatever his evaluation of her capacity to consent.

In short, as instructed, the jury did not need to find that Anderson's sexual conduct with JH was in fact non-consensual, nor did it need to find that Anderson knew JH was incapable of consent. It simply had to find that JH was incapable of consenting, and that he had not proven that he was unaware of her mental retardation.

## B. Analysis

Anderson contends that the phrase "incapable of appraising the nature of the conduct" in the definition of "mentally defective" is unconstitutionally vague. At trial, the jury instructions simply repeated this statutory language without elaboration.[6] Thus, any uncertainty we perceive when applying the statute now is the same uncertainty the jury would have perceived when deciding Anderson's guilt.

The degree of permissible vagueness depends on various characteristics of the statute:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.... The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

> Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it

---

6. In *State v. Callender*, 181 Or.App. 636, 47 P.3d 514 (2002), decided after Anderson's trial, the Oregon Court of Appeals provided some clarification as to what section 163.305(3) means. The state appellate court stated, "being capable of appraising the nature of a person's conduct requires more than a mere understanding of the physical aspects of the conduct. Instead, it includes an ability to contemplate and assess the 'right or wrong' and the 'moral quality' of the conduct." *Id.* at 520. As this limiting construction came ten years after the fact, and, more importantly, was not available to the jury at Anderson's trial, it does not alter the vagueness analysis. At the same time, that a state appellate court interpreted the statute to include concepts of "right or wrong" indicates that the jury could have done so as well, as I later discuss.

threatens to inhibit the exercise of constitutionally protected rights.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (footnotes omitted).

In Anderson's case, a relatively high standard of precision is required. This is a criminal conviction for personal, as opposed to economic, conduct. Additionally, as noted, there is no scienter requirement as to the ability of the victim to consent.

Further, the affirmative defense shifts the burden of proof to Anderson, requiring him to prove his lack of knowledge by a preponderance of the evidence, as opposed to merely showing that a reasonable doubt exists. *Cf. United States v. Mazurie,* 419 U.S. 544, 550 n. 9, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (noting, in the course of its vagueness analysis, the due process problems that arise when the burden of proof is shifted to a criminal defendant). Moreover, even aside from the shift in the burden of proof, the scienter requirement in the affirmative defense does not significantly reduce the vagueness problem here. Anderson could know of JH's mental retardation, thus ruling out the affirmative defense, without knowing that she was "incapable of appraising the nature of [her] conduct." There are degrees of mental retardation, of course, and many retarded people do engage in consensual sexual activity. *See generally* R.K. MONAT, SEXUALITY AND THE MENTALLY RETARDED: A CLINICAL AND THERAPEUTIC GUIDEBOOK (1982).

The final consideration that governs the degree of vagueness allowed in Anderson's prosecution is whether constitutionally protected conduct is implicated. As I demonstrate below, section 163.305(3)'s definition of "mentally defective," which ultimately determines whether or not JH can legally consent to sex, implicates the sexual liberty interest fleshed out in *Lawrence v. Texas,* and therefore does impinge directly on constitutionally protected conduct.

### 1. Substantive Due Process

The Supreme Court in *Lawrence* struck down Texas's same-sex sodomy law. 123 S.Ct. at 2484. In doing so, the Court affirmed the existence of a substantive due process right to engage in private, consensual sexual conduct. If the application of section 163.305(3) to Anderson's case implicates the protected conduct discussed in *Lawrence,* that statutory provision should be held to a heightened degree of certainty.

The question, then, is whether the sexual liberty interest outlined in *Lawrence* regulates the manner in which a state drafts and applies its statutory rape law as applied to adult victims. I believe it does.

Before proceeding, it is crucial to note the interrelationship between JH's sexual liberty interest and Anderson's: If JH has, in certain circumstances, a constitutionally protected right to consent to sex and she does in fact consent,[7] then there is no constitutionally legitimate basis, under *Lawrence,* to preclude Anderson from having sex with her *in those circumstances.*[8] Anderson therefore need not satisfy the doctrinal requirements of jus tertii or third-party standing (although I believe that he could). He asserts his own right to engage in private consensual conduct, not JH's.

---

7. Again, the jury never found that JH did *not* consent to sex with Anderson.

8. Of course, there may be a different basis, unrelated to lack of consent, for forbidding a given sexual act with a consenting adult—its public location, for example. Anderson's prosecution, however, was grounded only in lack of consent.

As written and as read to the jury at Anderson's trial, the language of section 163.305(3) is susceptible to at least two constructions that could, for reasons I survey below, impermissibly limit JH's ability to consent to sex: (1) the construction, ultimately proffered by the prosecution in this case after some wavering, that JH is *never* able legally to consent to sex; and (2) a construction that invites law enforcement, including police officers, prosecutors, judges, and juries, to impose its own sexual mores upon JH when deciding whether her consent was valid. Because section 163.305(3)'s indefiniteness is responsible for the availability of at least one construction, section 163.305(3) clearly implicated constitutionally protected conduct in this case.

The first reason why section 163.305(3), as written and as read to the jury at Anderson's trial, could implicate constitutionally protected conduct is that it is susceptible to a construction that JH will *never* be able legally to consent to sex. The jury could have easily interpreted the phrase "*incapable* of appraising the nature of the conduct" to mean that either JH is always capable of consenting to sex or she never is. This binary view of mentally retarded individuals generally and JH in particular might well be an unconstitutional imposition on their sexual liberty. Despite the lack of a consistent clinical definition of what constitutes a "valid" consent, *see infra* note 10, there is clear consensus among experts in the field of mental retardation that mentally retarded individuals experience sexual desire and can meaningfully consent to sex in *some* situations.[9]

The prosecution expert witnesses conceded as much at trial.

Moreover, JH has evidently engaged in voluntary sexual intercourse on a number of occasions in a manner that offended neither her mother nor the state. Given the general clinical belief that mentally retarded individuals desire and can "ethically" consent to sex, as well as JH's own desire and demonstrated capacity to understand and appreciate sexual contact, it could well be unconstitutional for Oregon law to hold that JH can *never* legally consent to sex. Section 163.305(3) is readily susceptible to this type of potentially unconstitutional application.

To conclusively demonstrate unconstitutionality on this ground, however, would require a more lengthy analysis than I have performed here, and would then still fall short of showing compliance with § 2254(d)(1)'s requirement that a contrary result would involve an "unreasonable application" of clearly established Supreme Court law. I need not engage in that endeavor, however, because I am convinced that section 163.305(3) implicates constitutionally protected conduct for a different reason.

Specifically, the statutory provision alternatively invites those applying the law to invoke their own sexual mores and override JH's sexual choice when deciding whether JH is capable of consent in a particular instance. During the pretrial hearing, the prosecutor first interpreted the statutory scheme in precisely this contextual manner. The prosecution's initial attempt at interpreting the statute was to propose a rule that JH's mother could

---

**9.** *See, e.g.,* K.R. Held, *Ethical Aspects of Sexuality of Persons with Mental Retardation,* 10 SEXUALITY & DISABILITY 237, 237–55 (1992); MONAT, *supra,* at 58–59 (1982); L. Heshusius, *Research on Perceptions of Sexuality by Persons Labelled Mentally Retarded* 51–52, *in* MENTAL HANDICAP and SEXUALI-TY: ISSUES AND PERSPECTIVES (Ann Craft ed., 1987). *But cf.* R. Binder, *Sex Between Psychiatric Inpatients,* PSYCHIATRIC Q. 121 (1985) (offering a dissenting view, but conceding that sexual relations may be therapeutic in some cases).

provide consent on JH's behalf. Realizing the problem with that interpretation, the prosecution suggested that JH's consent would be legally valid in the context of a "boyfriend-girlfriend" relationship. Finally, the prosecution arrived at the following reading of the statute: "I guess, what we would argue is that she is incapable of consent under all circumstances. It's just that in some circumstances we would not charge a crime and those were circumstances that were condoned by her mother, condoned by her in the sense of relationship and that gave her an individual right to life—life like the rest of us lead."

Expert testimony at trial also suggested an invitation to apply one's own moral framework to JH's sexual choice. In explaining why JH's consent was not valid, the prosecution's non-medical expert on sexually abused, mentally retarded individuals testified that whereas JH sees "sex" as merely a physical act, "If you ask, you know, anyone else what sex was or what intercourse is you see an entire picture. You see the candles, the wine, the dating, you know, whatever else goes on. With her sex is just one quick spur of the moment thing."

That the state may not burden a particular sexual choice out of distaste or disagreement is the central holding of *Lawrence*, 123 S.Ct. at 2478 ("When sexuality finds overt expression in intimate conduct with another person ... [t]he liberty protected by the Constitution allows homosexual persons the right to make this choice."). Taking Anderson's version of the facts as true (the jury having rejected the only other version of the facts available), JH's sexual choice was clearly demonstrated and uncoerced.

The line of cases concerning the analogous right of the mentally disabled to refuse medical treatment support the conclusion that the state is not free simply to ignore JH's particular sexual choice. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), Nicholas Romeo, a severely mentally disabled individual with an IQ below 10 who had been involuntarily confined and adjudged an incompetent, challenged certain conditions of his confinement, including the administration of bodily restraints. *Id.* at 311–12, 102 S.Ct. 2452. After recognizing Romeo's constitutional liberty interest in refusing the bodily restraints, the Court discussed two considerations justifying the liberty deprivation: the state interest in maintaining the safety and security of the institution, and the entitlement of the state to rely on the judgment of qualified health professionals when administering involuntary treatment. *See id.* at 321–23, 102 S.Ct. 2452; *see also Washington v. Harper*, 494 U.S. 210, 223–23, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (discussing only these two considerations as the legitimate state interests in the involuntary administration of antipsychotic drugs to a mentally ill prisoner).

Notably, the Court has discussed no other legitimate state interest in disregarding the desires of the mentally disabled to refuse medical treatment, and neither of the two considerations that the Court did discuss is applicable here. JH has not been involuntarily confined and poses no safety threat to herself or those around her. More important, Oregon's statutory rape scheme places the consent determination in the hands of a jury, not a psychiatrist, clinician, or parent.[10] Thus, those legitimate state interests that have been

---

**10.** Moreover, while deference to a health professional makes sense in the context of medical treatment, it may be less appropriate in the morally-infused context of sexual consent. *See, e.g.*, John M. Niederbuhl & C. Donald

Morris, *Sexual Knowledge and the Capability of Persons with Dual Diagnoses to Consent to Sexual Contact*, 11 SEXUALITY & DISABILITY 295, 304 (1993) (noting the lack of consis-

considered sufficient to override the constitutionally protected choices of mentally disabled individuals are not applicable here.

So, while the state surely has a very strong, legitimate interest in ensuring that the consent of a mentally disabled individual is knowledgeable and truly voluntary, and in disregarding that consent in situations where the alleged victim does not understand either the circumstances and consequences of sexual conduct or the extent of her ability to refuse sex, the state has no legitimate interest in imposing sexual mores on retarded individuals or their consensual partners.[11] When considering how to construct a regime that both respects the sexual choice of the mentally retarded and protects them from predation, others have recognized this distinction between an appropriate voluntariness inquiry and inappropriate moralizing. *See, e.g., State v. Sullivan*, 298 N.W.2d 267, 271 (Iowa 1980); *People v. Cratsley*, 86 N.Y.2d 81, 629 N.Y.S.2d 992, 653 N.E.2d 1162,

1165 (1995); Deborah W. Denno, *Sexuality, Rape, and Mental Retardation*, 1997 U. ILL. L. REV. 315, 321 (1997).

## 2. Vagueness

As part of a criminal statute that targets constitutionally protected personal conduct without an effective mitigating scienter requirement, section 163.305 is precisely the type of law that must convey its interdictions with a heightened clarity to be valid. *See Village of Hoffman Estates*, 455 U.S. at 498–99, 102 S.Ct. 1186. A law's vagueness is evaluated in light of the two policies underlying the doctrine, providing fair warning to the defendant and establishing standards to guide law enforcement, the latter being more important than the former. *See Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). I focus on this second element, noting, however, that the lack of guidance to law enforcement and the lack of notice to Anderson are by no means unrelated matters.[12]

---

tent professional standards for evaluating capacity to consent).

**11.** The Supreme Court has recognized an analogous principle in the First Amendment context:

We have sometimes said that [certain] categories of expression are "not within the area of constitutionally protected speech," or that the "protection of the First Amendment does not extend to them." Such statements must be taken in context, however, and are no more literally true than is the occasionally repeated short-hand characterizing obscenity "as not being speech at all." What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel, but it may not make the further con-

tent discrimination of proscribing *only* libel critical of the government.
*R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–84, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Similarly, that a government may legitimately regulate the sexual conduct of "persons who might be injured or coerced or who are situated in relationships were consent might not easily be refused," *Lawrence*, 123 S.Ct. at 2484, does not mean that it may do so by imposing moral judgment concerning *appropriate* sexual behavior not applicable to others.

**12.** It is likely that Anderson did not receive fair warning that his conduct was illegal. At the time of his sexual encounter with JH, the Oregon courts had not yet read any substance into section 163.305(3)'s definition of "mentally defective." Thus, one might well have looked to New Jersey law, which employs an identical "appraising the nature of the conduct" standard. *See, e.g., State v. Olivio*, 123 N.J. 550, 589 A.2d 597, 605 (1991) (holding that a mental defect exists when "at the time of the sexual activity, the mental defect ren-

That section 163.305 does not establish meaningful standards to guide law enforcement rang true in a very literal sense during Anderson's trial: the trial court failed to supply *any* explanation to the jury as to what "incapable of appraising the nature of the conduct" means. Thus, jurors may well have interpreted section 163.305(3) *either* as a blanket disqualification of any attempt by JH to consent to sex, or as an invitation to apply their own moral views to JH's conduct. The former possibility flows directly from the statutory language *"incapable* of appraising the nature of the conduct." The latter does as well. A natural "human response," to being asked about the *"nature"* of particular sexual conduct is to focus on one's own sense of the morality or wisdom of that conduct. *See Cratsley*, 629 N.Y.S.2d 992, 653 N.E.2d at 1165. That section 163.305(3) is susceptible to the second, contextual interpretation renders it a paradigmatic violation of the prohibition against vague criminal laws.[13]

The contextual interpretation of section 163.305 squarely conflicts with the precepts underlying the vagueness doctrine. The open-ended character of section 163.305, which potentially allows those applying it to invoke their own personal moral standards, "impermissibly delegates ba-sic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294. Subjecting Anderson to the prevailing social morality on sexual conduct is particularly dangerous, because of "the discredited but long-held view of mentally retarded females as either asexual or hypersexual—perceptions fueled, in part, by fear of their procreation." Denno, *supra*, at 321.

Even before *Lawrence*, when governmental regulation of private adult sexual conduct was not subject to heightened scrutiny, the Iowa Supreme Court held a statute criminalizing sexual activity with a person who "lacks the mental capacity to know the right and wrong of conduct in sexual matters" unconstitutionally vague. *See Sullivan*, 298 N.W.2d at 272 (reasoning that "[i]mpossible uncertainty over the so-called general mores" renders a moral "right and wrong" test "an unfit tool for determining the mental competency of a person to consent to a sex act"). As the jury, due to lack of instruction, could have interpreted section 163.305 as a morality-based "right and wrong" test, Anderson's conviction violated due process.

dered him or her unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another"). JH's understanding of the physical mechanics of sex and her trial testimony that she in fact said "No" and "Stop" suggest that she would not have been considered "mentally defective" under New Jersey law. Alternatively, for the reasons pertaining to legislative history provided in *State v. Callender*, 47 P.3d at 519–20, one may have looked to Iowa law for guidance concerning the phrase "appraising the nature of the conduct." Iowa law would have revealed, however, that the legislation upon which the Oregon statute had supposedly been modeled was partially struck down by the Iowa Supreme Court on federal constitutional vagueness grounds for impermissibly moralizing sexual conduct, and that only a "nature and consequences" standard survived. *See State v. Sullivan*, 298 N.W.2d 267, 272–73 (Iowa 1980). Because JH testified at trial that she understood the pregnancy and STD consequences of intercourse, she would likely have been capable of sexual consent under the Iowa regime. Thus, it is likely that Anderson did not receive fair warning that his conduct was illegal.

**13.** As noted, *supra* at 1041–42, the first interpretation may well also unconstitutionally impinge on JH's right to engage in sexual behavior, but I need not so decide for purposes of this dissent.

I have no doubt that the statutory scheme could be applied in a more restrained manner that comports with constitutional directives. A meaningful scienter requirement is the most obvious adjustment.

Another way to bring the statute into line with constitutional norms, albeit one rejected in *Callender*, is to construe the statute as applying only when the victim is not able to comprehend the physical aspects of the sexual act and its physical consequences—pregnancy, for example, and disease. That test for capacity to consent would be quite clear, and appears to be the majority interpretation for statutes of this sort. *See* Elizabeth J. Reed, *Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity*, 83 VA. L. REV. 799, 813–14 & n. 110 (1997). Under it, Anderson could not have been convicted, as the evidence established that JH did have that degree of understanding.

The path Oregon instead chose to pursue after Anderson's conviction—tying capacity to consent with the "ability to contemplate and assess the 'right or wrong' and the 'moral quality' " of the sexual act, *see Callender*, 47 P.3d at 520—is problematic, *see Sullivan*, 298 N.W.2d at 271 (rejecting, on vagueness grounds, precisely this interpretation of the Iowa statute), but not unsalvageable. With improved jury instructions, the *Callender* approach might survive a vagueness challenge. Idaho, for instance, also requires that the putative victim be able to assess the moral quality of the act, but makes clear in its detailed jury instructions that it is the mental capacity for moral reasoning of the consent-

ing individual, *not* the morality of the act itself, that is legally relevant. *See State v. Soura*, 118 Idaho 232, 796 P.2d 109, 113 n. 1 (1990).[14]

In any event, the manner in which the statute *was* applied was unconstitutional both as to Anderson and as to JH.

I respectfully dissent.

---

**14.** I note, however, that the *Callender* decision, as written, does not conclusively commit Oregon to one particular definition of capacity to consent, but instead is open-ended, adding to rather than detracting from the vagueness of the statutory scheme. 47 P.3d at 520 ("[B]eing capable of appraising the nature of the person's conduct requires more than a mere understanding of the physical aspects of the conduct. Instead, it *includes* an ability to contemplate and assess the 'right or wrong' and the 'moral quality' of the conduct.") (emphasis added).